73 So.2d 652 (1954)
SMITH
v.
INTERNATIONAL PAPER CO.
No. 8161.
Court of Appeal of Louisiana, Second Circuit.
June 25, 1954.
Rehearing Denied July 16, 1954.
Morgan, Baker & Skeels, Shreveport, for appellant.
Madison, Madison, Files & Shell, Bastrop, Dan W. Stewart, Jr., Minden, for appellee.
AYRES, Justice.
This is a suit for workmen's compensation. Plaintiff, a forty-four year old colored man, suffered injuries August 13, 1952, when he fell from a platform to the bottom of a concrete ditch or pit while engaged in work as a cement finisher for the International Paper Company at its plant at Cullen, Webster Parish, Louisiana.
From a judgment rejecting his demands, plaintiff has appealed to this court.
The sole issue before the court is whether or not there was a causal connection with the paralytic stroke suffered by plaintiff November 7, 1952, and the accident of August 13, 1952. Our learned brother of the district court concluded that plaintiff failed to establish his case or to substantiate his claim by that degree of preponderance of evidence as required by law in workmen's compensation cases.
To determine the controversy in this case, we begin with the premise that the burden rests on plaintiffs in compensation cases to *653 make out their cases with legal certainty by a preponderance of evidence as in other civil cases, and that judgments cannot be based upon speculation, conjecture or mere possibilities. Roberts v. M. S. Carroll Co., Inc. La.App., 68 So.2d 689.
It is deemed necessary, therefore, that the evidence be carefully scrutinized to determine whether or not a causal connection exists between the accident sustained by plaintiff and the disabilities presently suffered by him. It was well established by the evidence and now is admitted that plaintiff, immediately following the accident, and at the present time, is totally disabled.
The pit or ditch over which plaintiff was engaged was approximately seven and one-half feet deep and about nine feet wide, the sides and bottom of which were concrete. In the course of his work he was struck in his side by a concrete bucket conveyed by a crane on its return trip from depositing materials in place, over-balancing him and precipitating a fall headforemost to the bottom of the pit. As a result of the fall, plaintiff asserted he was rendered unconscious and dazed and was assisted from the bottom of the pit by fellow workers, whose testimony in this respect was corroborated by that of two fellow employees, Sam Miller and Clint Miller, the latter apparently being in charge of this particular work.
Defendant's employees, M. C. Maguson, safety director, and E. E. Watson, labor foreman, testified they saw the accident, rushed to the scene in a matter of seconds and contradicted plaintiff's assertion that he was dazed and unconscious and had to be assisted from the pit, who stated that on their arrival plaintiff was standing upright and came out of the pit unassisted.
Plaintiff sustained a cut on the chin requiring four or five sutures for closing, a sprained left wrist and a fracture of the right arm. He was assisted to the first aid station by Maguson, where Mrs. L. Spencer, a registered nurse, observed he had a nasty cut on his chin, more like a bruised laceration than a clear cut, bleeding but not hemorrhaging, and who stated he was hurting from the injury to his mouth and that he had plenty of pain at times with his arm, of which he complained at the time.
After receiving first aid, plaintiff was referred to Dr. W. C. Gray at Springhill, who sutured the wound on his chin and made an examination, concluding, in addition to the chin laceration, that plaintiff sustained a sprain of his left wrist and a possible fracture of his right arm. Dr. Gray referred him to Dr. Rutledge, dentist, concerning the possibility of damage to his teeth.
Notwithstanding these injuries, plaintiff returned to work but, on account of the pain and suffering, was unable to complete the day, and the foreman of the job so informed his superiors, and plaintiff was again returned to Dr. Gray. The record is not clear as to what examination or treatment was given on plaintiff's second visit to Dr. Gray, but it would appear that he was allowed to return home. The following morning he reported for work but his arm was badly swollen and he was instructed by the nurse to see a doctor and inquired as to his preference, which was Sanders Clinic at Shreveport, Louisiana, his home town.
On arriving at that clinic, plaintiff was referred to Dr. C. A. Kinnebrew, who diagnosed his injuries as a fracture of the radius bone of the arm, laceration of the chin and finger, which had already been sutured by Dr. Gray, and a sprained left wrist. Plaintiff's arm was set in a cast from August 13 until September 12, 1952. Dr. Kinnebrew discharged him as well and able to return to work September 29, 1952.
The next occasion Dr. Kinnebrew saw plaintiff was in the Charity Hospital December 11, 1952, where the doctor was sent on the request of the defendant to ascertain plaintiff's condition. At that time plaintiff was suffering from a paralytic stroke causing paralysis of his hand, side and leg and of his swallowing muscles, with impediment of speech.
After being discharged by Dr. Kinnebrew, plaintiff worked one day on a job at Mooringsport and another day at Haughton, and then for about three weeks at Barksdale Field. The testimony establishes that he *654 was not physically able or capable of doing the work of a cement finisher in his usual and customary manner. He was given a light job in connection with the work and was assisted in holding his job by fellow employees. He was at times released in the afternoon because of his inability to continue work.
On the afternoon of November 7, 1952, after being transported in a truck to within a few blocks of his residence, where he was to continue walking home, he became unstable in his walk and actions, veered to the left, and after reaching home became progressively worse, his right side paralyzed and his vocal chords affected, making him unable to talk without difficulty. Dr. J. C. Sanders was summonsed and, upon arriving, found plaintiff exceedingly ill, paralyzed, with difficulty in respiration. Upon his advice, plaintiff was removed to the Schumpert Sanitarium, where he remained for approximately ten days to two weeks. Dr. John B. Sutton, a specialist in neuro surgery, was called in for consultation. Plaintiff also was examined by Dr. Ford J. MacPherson, an orthopedic specialist, June 9, 1953.
The testimony of plaintiff and his fellow workers that he was dazed and rendered unconscious by the fall and had to be assisted from the pit appears more consistent with reason and in accord with the natural and most probable consequences of the fall experienced by plaintiff striking his chin and arm on a solid concrete foundation than the improbability of Maguson's and Watson's testimony that plaintiff was apparently unhurt and unaddled, and, therefore, contrary to the normal consequences and occurrences in such an accident. Plaintiff was visibly affected by the injuries sustained, even after returning to work, which caused the foreman to take him off the job and report to his superior.
A review of the testimony of these experts will now be attempted for the purpose of discovering the relationship or the causal connection, if any, between the accident of August 13, 1952, and the affliction suffered by plaintiff on November 7, 1952.
Dr. John B. Sutton, a specialist in neuro surgery, who examined plaintiff on several occasions while in both the Schumpert Sanitarium and Charity Hospital, and after reviewing the history of plaintiff's accident and injuries, on the matter as to his conclusions with reference to the relationship or causal connection between the original injuries sustained August 13, 1952, and the paralytic condition that developed November 7, 1952, stated:
"* * * I thought there was a fairly good possibility of connection, but I cannot say positively there was a connection. I do not believe it could be stated by any one positively and with a dead certainty. But he had received apparently a head injury which, I am told, was rather severe, and I am told he continued to attempt to do his usual work thereafter, but could not perform it, but attempted to carry on with assistance, and in such attempt he could possibly have had a recurrence, or possibly a new hemorrhage, which is entirely possible. When a man has had a serious brain injury he is considered more susceptible to further vascular actions in the future. I mean I cannot positively connect the two things, but that is a logical conclusion."
In plaintiff's previous condition of good health and he being a willing, ready and skilled worker, aged forty-four, the possibility, in the doctor's opinion, was that a stroke, without some cause such as the accident in this case, was improbable. The doctor elaborated upon his opinion by giving this testimony:
"Q. Now, Doctor, if a man such as Pheado Smith is reported to have fallen, or been knocked, some several feet into a concrete pit, and if he was knocked unconscious, would that indicate brain injury? A. I feel that he would almost certainly have brain injury if he was knocked unconscious, or dazed by it.
"Q. Doctor, if Pheado Smith was knocked into a concrete pit about some eight feet below, striking a piano wire *655 stretched across the top of that pit, and then fell to the bottom of the pit on his right arm, striking his chin, causing lacerations and bruises, indicated by blood on the chin, and sprained his left wrist, and sprained his right toe, would it be necessary for him to have been knocked unconscious to suffer or sustain a brain injury? A. No sir.
"Q. Now, Doctor, will you explain in so many words how this blood clot could form in the brain stem? A. A blood clot may form in one of two ways. It may form what is called a thrombosis, which is a blood clot, in a blood vessel, where it eventually blocks, or partially blocks, the blood supply to the brain stem, or it can hemorrhage within the brain stem itself. The latter are more likely to open up and hemorrhage again and cause injury such as would be real serious due to the fact of the twisting of the head and the length of the head and neck, sometimes causing the stem to hemorrhage. The most severe blood clots are not produced sometimes from the most severe injuries. Some are relatively trivial head injuries, with sometimes no history of head injury at all.
"Q. Doctor, in your examination, or from your examination, is it your opinion that it was probably a clot in the brain stem that caused this man's condition? A. That seems the most likely diagnosis. And it would have to be very small to compare it. In this case thrombosis seems to be less likely because of the conditions involved in his symptoms.
"Q. Now, Doctor, would you state how it would be possible that such an injury as Pheado Smith received, how it could result in a paralytic condition some two months and three weeks after the happening of the original trauma. A. I believe in such case it would have to be repeated bleeding. In other words, it would have to bleed again. It would be one hemorrhage but which resulted in repeated bleeding.
"Q. Now, if he had repeated bleeding what would be the outward manifestations of that happening? A. It would depend entirely on where it was in that part of the brain. If it was in a part near the cerebellum which would impair coordination to some extent, then he might stagger, or vary in one direction or the other.
"It is also near certain large motor tracts which would cause weakness, or paralysis on the same or opposite side, depending on the elevation and location of the lesion. In his case I think it was apparently on the opposite side. It is near certain sensory fibres which intervate the opposite side, carrying the feeling of pain and temperature and such sensations might be susceptible of causing numbness and paralysis. It is under the descending tract which feeds the fifth intercranial nerve which carries sensation from the same side of the superficial portion of the facies nucus, and an involvement of that tract might cause some numbness of the facies on the same side.
"Q. Now, if his work prior to the time that he was injured indicated that he was a very skilled worker, and that at the time he was injured he could move and use a trowel, and that he could do the work of what is called as botching and dobbing the concrete, would all of that indicate that he had full control of the coordination of his muscles? A. Yes.
"Q. Would that be an indication that there was full cooperation and coordination of his nervous system? A. Yes, I think it would."
Dr. Kinnebrew, testifying for the defendants, was of the opinion that it was unusual for a man of plaintiff's age and state of health to have a stroke; and that a subdural hemotoma, defined by him as a clot of blood beneath the thin membrane surrounding the brain, producing pressure eventually on the brain, is one of the causes of paralysis. This may occur even with the rupture of a very small blood vessel, which might require *656 an indefinite time to build up pressure sufficient to cause paralysis. From this doctor's experience, six months was the longest time that paralysis resulted, but he stated there are cases of record of longer periods of time before a subdural hematoma manifested itself in paralysis. The doctor was of the opinion that it was possible that the accident and injuries sustained by plaintiff could have produced an injury that resulted in a subdural hematoma, although he said that subsequent examinations did not seem to bear it out. However, he testified:
"Q. Now, Doctor, assuming that at the time he fell he was knocked unconscious, that is at the time of the accident, would that be any indication to you of a brain injury? A. Any time anybody is knocked unconscious it is an injury to the brain, however minor, or however severe, they have had a concussion to the brain.
"Q. Now, Doctor, assuming that this same man shortly thereafter, after the happening of the accident, down to the present time, has complained of a burning sensation beginning right behind the ear, down his neck, through his right arm, through his right side, down his right leg to his foot, would that indicate that he had had any kind of brain injury? A. That would indicate he had so-called brain or upper spinal cord pathology. In other words, that means there would be some change in the normal function.
"Q. Where a man has had a head injury and a condition like that develops, would that prove there has been some injury, or would there be any indication in connection with it? A. It sure would. It would be `incriminating evidence' as you lawyers say."
Although this witness made no particular head examination of the plaintiff other than his lacerated chin he admitted, for lack of information as to any injury sustained by plaintiff to his brain or nervous system, he was not in position to know fully plaintiff's condition. The doctor, of course, was not a specialist in diseases of this kind. The doctor testified further:
"Q. What is your opinion as to whether or not that fall which he complained of on the 13th of August, 1952 had anything to do with reference to the paralysis from which he was suffering when you saw him in December? A. Well, that would depend upon what was the actual condition going on in his brain. That is what that would depend on. I had thought up to that time that he had completely healed, until he came down with the paralysis, and I assumed at that time that he had some other disability that actually caused it. I would like to say, however, that I did not know the exact trouble this man had in his brain, what was causing the trouble.
"Q. Now, Doctor, again, what would you say with reference to a blow that occurred two months and three weeks prior to the paralysis stroke bringing the paralytic stroke on? A. Well, there are some things a man can get from a fall that develop later on as a result of the fall, but at the time I saw this man the possibilities that he had one or some of the conditions that could result from the fallit didn't appear to me that he had those at that time.
"Q. What was your opinion with reference to the fall having anything to do with the paralysis? A. I don't know. I can't answer that. I just can't answer that. I don't know just what the condition of his brain is inside. I can't answer that.
"Q. Doctor, many things can cause paralysis other than a fall, isn't that true? A. Yes, I can say that.
"Q. I am asking you whether or not of course you do not know positively, but what do you think, or do you think that that fall had anything to do with the paralysis? I am asking your opinion on it. A. When I noted that paralysis *657 I didn't have all of the facts at hand. I told them when I saw him in the hospital that I didn't see how the paralysis entered into the condition he had from the fall when I saw him that day because there was nothing about it that I could connect up with the fall, but I did not have all of the facts. After I got a definite diagnosisif I could get a definite diagnosis of what his actual condition is, and what is causing his condition, I could give a better opinion. Now, I am more or less forced to rule the fall out as having nothing to do with it. Do you know what is wrong with him inside his head?
"Q. No sir, I don't know anthing about it. A. Well, he had several consultants to see him in order to diagnose his cerebral condition, it appears. I don't know exactly what his condition was, whether it was sudden fainting spells, or whether he had trouble in between timeshe didn't give me any information at all that he had any trouble like that when I treated him and discharged him as being well, and then the next time I saw him he was suffering with a paralytic stroke, or something wrong with his brain.
"Q. You did not observe anything on the left side of his head that would indicate that he had an injured left side? A. No, sir, I did not.
"Q. You gave as your opinion that in view of the fact that it had been so long developing this paralysis after the fall that it was your opinion that it had nothing to do with the paralysis at that time, did you not? A. I wrote that down when I saw him back in November, yes. I wrote a report to the effect to the International Paper Company, wasn't it?"
His conclusion was that it was hardly possible that the paralytic condition was connected with the injuries sustained by plaintiff.
Dr. J. C. Sanders, testifying for the plaintiff, was of the opinion that such an injury as sustained by plaintiff could cause or was sufficient to cause a subdural hematoma. His opinion was that the paralytic condition was possibly caused from the original injuries. From his experience, a subdural hematoma usually occurs from eight to ten weeks after signs and symptoms develop, though he could not positively state there was a connection between the injuries and the subsequent condition, the evidence, in his opinion, pointed to the fact that the injury produced the paralytic condition.
Dr. W. C. Gray, a general practitioner of Springhill, Louisiana, was of the opinion that the accident could have caused a brain injury and there was a possibility that such injury had a connection with the paralytic condition that subsequently followed, but that it was improbable, and he did not attribute the condition to the accident.
Dr. Ford J. MacPherson, orthopedist, who examined plaintiff June 9, 1953, recognized that the specific difficulty inquired about was outside of his realm of specialization and stated that a neuro surgeon was in better position to give an opinion as to plaintiff's condition. He was of the opinion, however, that plaintiff sustained in the accident some shaking up of the brain sufficient to cause a blood clot which could have produced a subdural hematoma, but that, since the paralytic condition was late in manifesting itself, he was of the opinion that the blood clot did not likely produce the condition, but that he was prone to think the development was in the base of the brain stem. His opinion was that, on the basis of the history of plaintiff's injury, the injury produced the paralytic condition.
Dr. Sutton was the only medical expert in neuro surgery testifying in the case. In considering the medical testimony, it is important to give consideration also to the lay testimony, the value of the former depending somewhat on the facts shown by the latter. Since the occurrence of the accident, plaintiff has been totally disabled from engaging in his work as a cement finisher. In addition to his broken arm, lacerated chin and other bruises, plaintiff has constantly suffered from fatigue, headaches *658 and nervousness, with numbness in the area of the right side and legs. Plaintiff apparently made every effort to continue to pursue his occupation. He was not a malingerer; he was an insistent, willing worker. He endeavored to work the remainder of the day after he was injured and reported for work the following morning. He made further efforts on three other occasions, the first two of only a day's duration and the last about three weeks, during which, the testimony shows, his fellow employees assisted him by placing him on the lightest job possible and doing the work in his behalf.
These facts convince us that plaintiff had no thought of a compensation claim or of building up a case therefor. It is stressed, however, that plaintiff did not complain or report his symptoms to the physicians. This unusual attitude is sometimes taken by many people. As to his reasons, any statement would be only a conjecture, but plaintiff is an uneducated colored laborer and could not be held to the same strict accountability as one with experience or having knowledge of the importance of making timely complaints and reports as to his condition. He was no doubt not in a position to fully appreciate and understand his exact condition.
Defendant earnestly insists that plaintiff has failed to make out his case by a preponderance of evidence and beyond a mere possibility, hence, emphasizes that the jurisprudence of this State has established the rule that plaintiff in a compensation case, as in all others, bears the burden of proof and is required to establish his claim to a legal certainty by a reasonable preponderance of evidence and that the establishment of his claim to the extent only of a possibility or even a probability is insufficient. With these legal requirements we agree. Roberts v. M. S. Carroll Co., Inc., La.App., 68 So.2d 689.
The question is whether there was causal connection between the paralytic affliction suffered by plaintiff November 7, 1952, with the accidental injury of August 13, 1952. Plaintiff's injury was sufficient to produce and was capable of producing injuries from which his present condition could have been caused. The medical experts appear to agree on this point. The injuries sustained produced the conditions and symptoms that ordinarily and naturally precede a paralytic affliction. No other cause for the paralysis has been suggested or established.
Mention is made of the fact that the expert witnesses did not or could not positively link the connection between the accident and the subsequent condition. All the experts agreed, however, that it was possible and that such condition could have resulted from such an accident.
Dr. Sutton, after discussing the details and facts of the case and the basis of his opinion, stated:
"I told Mr. Skeels I thought there was a fairly good possibility of connection, but I cannot say positively there was a connection. I do not believe it could be stated by anyone positively and with a dead certainty. But he had received apparently a head injury which, I am told, was rather severe, and I am told he continued to attempt to do his usual work thereafter, but could not perform it, but attempted to carry on with assistance, and in such attempt he could possibly have had a recurrence, or possibly a new hemorrhage, which is entirely possible. When a man has had a serious brain injury he is considered more susceptible to further vascular actions in the future. I mean I cannot positively connect the two things, but that is a logical conclusion." (Emphasis supplied.)
What more could have been the effect had this expert and the others testifying in the case said positively there was a connection between the accident and the paralytic stroke? Would not such statements have been only and merely their opinions? How could it have been otherwise? And by these experts in their testimony stating their conclusions as their opinions from the facts and circumstances and from their examinations of plaintiff, how could that *659 weaken their testimony when it is well known to all they are merely expressing their opinions and having the honesty and sincerity to so acknowledge?
We are advised by one of these witnesses that the only way to determine beyond a doubt the cause of a paralytic stroke is through the performance of an autopsy on the brain. We are not of the opinion that plaintiff is required to make such proof of his claim to such a degree of certainty but only by a preponderance of the evidence and by the best and only evidence obtainable. In our opinion, he has sustained that burden. To require more would not only be placing an undue burden and hardship upon the plaintiff in a workmen's compensation case, but also would be denying to plaintiff the liberality in the construction of said statute as intended.
In the case of Stringer v. Brown Paper Mill Co., Inc., 224 La. 964, 71 So.2d 343, wherein plaintiff, a twenty-eight year old white man, suffered injuries May 18, 1952, when he cut his left foot with an axe while engaged in his employment as a common laborer for the Brown Paper Mill, Inc., he claimed that in addition to the injury to his foot the mis-swing of his axe in attempting to cut a tree caused him to wrench his back and, as a consequence, resulted in a rupture of an intra-vertebral disc which rendered him incapable of doing work of a reasonable character. The defense was that the alleged back injury was not attributable to the accident. Shortly after the accident plaintiff began experiencing pain in his back and other parts of his body, which he reported to the defendant's physician, who, notwithstanding, pronounced him well enough to return to work. He worked from May 27 until June 13, 1952, when he quit work, claiming that he was leaving because his work was not satisfactory to his foreman. He was examined June 26, 1952, by another physician who diagnosed his case as strongly suggestive of a ruptured intra-vertebral disc. After reporting to his personal physician, who was also the defendant's doctor, August 19, 1952, the doctor's diagnosis of a disc syndrome was reaffirmed and plaintiff was supplied with a brace. Following, on October 7, 1952, plaintiff was again examined by an orthopedist, who advised the performance of a myelogram, which is said to be a test, which, if positive, would indicate the necessity of surgery. On the same date, two other orthopedic specialists examined and made tests of plaintiff and reported plaintiff had not sustained the disc injury but was able to perform manual labor. To the Supreme Court, which had issued writs directed to this court under its decision reported in 66 So.2d 640, there were posed two questions: First, whether plaintiff had suffered a back injury disabling him from performing work of a reasonable character; and, second, whether his disability was attributable to the accident of May 13, 1952. The Court, as it stated, experienced no difficulty in finding that plaintiff was totally disabled, and reached that conclusion, in view of the finding of one orthopedic specialist and defendant's physician, notwithstanding the contrary opinion of two other orthopedists and the testimony of ten fellow employees that plaintiff did not complain of back and leg pains during the period after he resumed work following the foot injury. The Court said [224 La. 964, 71 So.2d 345]:
"Under the circumstances, to reject plaintiff's testimony as to his pain and suffering would necessarily brand him as a malingerer notwithstanding that his complaints are substantially corroborated by respectable medical opinions that he has sustained a disc injury."
In the case now before us, there is no question of the plaintiff's present condition and, as held in the above quoted case, the delayed manifestation of plaintiff's brain injury or injury to his nervous system or his failure to become aware of them, his failure and omission to disclose information to his doctors and the examining physicians of all his symptoms and complaints, we do not believe, are of sufficient import to require a rejection of plaintiff's claim of causal connection between the paralytic stroke and the fall sustained by him. His *660 failure to report fully his complaints has been explained to our satisfaction.
This court held in Hayes v. Louisiana Long Leaf Lumber Co., 51 So.2d 855, that the plaintiff sustained his burden of proof of showing that a hernia manifesting itself first during June of 1949 was the result of an accident on March 31, 1949.
The facts in White v. Delta Shipbuilding Co., Inc., La.App., 24 So.2d 497, were that plaintiff, a thirty year old colored laborer, during July, 1942, while engaged in the performance of his duties of employment with the defendant of cleaning up debris on the deck of a ship under construction, was struck on the head, shoulders and back by a large steel or iron valve, which fell from a height of some eight or ten feet, rendering him unconscious. He received treatment at the first aid station, then treated at a hospital for a week, after which he returned home but received treatment until March 30, 1943, when his employer's physician advised that he was fully recovered. Plaintiff returned to work on that date, but shortly thereafter complained of severe pains in his chest, making it impossible for him to work. The defendant's physician pronounced him a malingerer. Plaintiff entered Turo Infirmary where his trouble was pronounced hypertensive heart failure. Later, he was admitted to the Charity Hospital of Louisiana where his ailment was diagnosed as chronic glomerular nephritis and cardiac decompensation. Notwithstanding the heart ailment did not manifest itself for more than eight months after the accident, the court relied upon the testimony of Dr. Jacobs, who was positive there was causal connection between the traumatic injury and the subsequent heart ailment. Dr. Jacob's testimony, notwithstanding its form of positive character, is nonetheless the Doctor's opinion, of the same kind and character and with no more strength than that of Dr. Sutton, as quoted hereinabove, who said that he could not positively "with dead certainty" connect the two things, that is, the accident and plaintiff's paralytic condition, "but that is a logical conclusion."
As was aptly said by the Supreme Court in Robichaux v. Realty Operators, Inc., 195 La. 70, 196 So. 23, 26, after observing there existed some doubt of the occurrence of the accident, "just as there is, essentially, some such doubt in all cases where the injury complained of might have resulted from some other cause, and where the alleged accident did not at first seem to be a serious accident", the Court stated: "It is not necessary that an accident should seem immediately to be something serious in order to come within the definition" of the statute.
See also Cook v. M. J. Walsh Boiler Scaling Co. Inc., 40 So.2d 655, 658, wherein the Orleans Court of Appeal declared:
"In many cases it may be impossible for a plaintiff to make his case certain beyond the shadow of any possible doubt and all that he is required to do is to convince the Court by a reasonable preponderance of the evidence that in all probability the occurrence took place as recited by him.
"In addition, however, to showing that there was an accident, plaintiff in such a case as this must go further and show by the same reasonable preponderance that in all probability the ensuing disability resulted from the injury."
Considering the facts of this case as a whole, we conclude that plaintiff's present paralytic condition had a causal connection with and was produced by and resulted from the accident and injuries sustained by him August 13, 1952, and that, since he is totally, permanently disabled, he is entitled to the relief sought.
For medical and hospital services and doctor bills $156.20 was incurred by plaintiff.
For the reasons assigned, the judgment appealed from is reversed, and it is now ordered, adjudged and decreed there be judgment herein in favor of plaintiff, Pheado Smith, against the defendant, International Paper Company, for compensation *661 at the rate of $30 per week, beginning August 13, 1952, for the period of plaintiff's disability, not, however, exceeding four hundred weeks, with five percent per annum interest on each of said weekly installments from its maturity until paid, and for all costs, less and except the sum of $210 for seven weeks' compensation previously paid, and for hospital and medical expense in the sum of $156.20, with legal interest thereon from judicial demand until paid.
It is further ordered, adjudged and decreed that plaintiff's attorneys' fee be and the same is hereby fixed at the sum of twenty percent of which he may collect and recover, not to exceed, however, $1,000.
It is further ordered, adjudged and decreed that the fees of the expert witnesses testifying herein be and the same are hereby fixed at the sum of $35 each and taxed as costs.
Reversed and rendered.