83 So.2d 575 (1955)
Leoyou PAYTON et al., Plaintiffs-Appellants,
v.
GREAT AMERICAN INDEMNITY CO. et al., Defendants-Appellees.
No. 8404.
Court of Appeal of Louisiana, Second Circuit.
November 2, 1955.
Rehearing Denied November 29, 1955.
Writ of Certiorari Denied January 16, 1956.
*576 W. Peyton Cunningham, Natchitoches, for appellants.
Morgan, Baker & Skeels, Shreveport, for appellees.
AYRES, Judge.
The plaintiff, Leoyou Payton, individually and as natural tutrix of the minor, Pauline Payton, a child of her marriage with Sam Payton, deceased, and of his mother and brothers and sisters, as well as a foster child, instituted this action for damages for pain suffered by the said Sam Payton and for the loss of his life, and for medical, hospital and funeral expenses, and for damages to a Studebaker pick-up truck, resulting from an accident of June 29, 1951, with a 2½ ton International truck of the Department of Highways, driven and operated at the time by Cesmer Gallien, on State Highway No. 20, a gravel surfaced highway about one mile northwest of Powhatan in Natchitoches Parish, Louisiana.
The action as to all parties plaintiff, except as to Leoyou Payton, the surviving widow, and the minor, Pauline Payton, was dismissed on exceptions and the only parties plaintiff now before the court are the aforesaid widow and the minor child, of which she is natural tutrix.
Highway 20 in the vicinity of the accident herein involved runs in a generally east and west course north of the right of way of the Texas & Pacific Railway. Located to the north of the highway is the Breazeale Plantation owned by Ned Henry, which is enclosed by a fence. A private road through the plantation passes through a gate or gap and intersects the highway at right angles. This private road led to a sawmill owned and operated by Sam Payton, who was engaged in the manufacture of railroad ties, and further to a bar pit on Red River, from which sand was being obtained at the time by a fleet of trucks of the Department of Highways for use in constructing a new paved highway for Highway No. 20 located south of the railroad. Traffic over this plantation road was described as a beehive of activity, to Gallien's knowledge, due to traffic not only to the sand bar but to the sawmill as well.
The defendant, Cesmer Gallien, was operating a gravel truck for the Department of Highways and hauling gravel from a location west of Powhatan to a point east of the scene of the accident for use on a project of an intersecting road known as the "Allen Road". Sam Payton drove his Studebaker truck from the mill site to the plantation gate, where he stopped, and, after observing the approach of defendant's truck from the east, and, presuming it to be one of the trucks used in the sand hauling project, drove through the gate out into the highway so as not to obstruct the passage and turned left, with his back wheels 18 inches beyond an imaginary center line of the graveled highway, which was 32 feet in width, with the front of his truck 3 or 4 feet beyond the center, when the approaching truck driven by Gallien at about 20 feet distance on his right-hand side, Payton's left-hand side, swerved to the driver's left and struck the left front side of the Payton truck, knocking it into the roadside ditch. Plaintiff alleges that defendant's truck was approximately 220 feet away when Payton drove onto the graveled highway.
Plaintiff charges defendant with negligence in leaving a place of safety upon his own right-hand side of the highway and swerving his truck to his left, crossing the center line of the highway and striking the Payton truck with such considerable force as to push the pick-up sidewise into the ditch, the right front and rear wheels coming to rest in the ditch, with the left wheels remaining on the shoulder of the road, and particularly in not maintaining a proper lookout at a dangerous intersection where unusual traffic conditions prevailed; in not seeing decedent or his truck until he was only 20 feet away; in not maintaining *577 proper control of the truck and by not applying his brakes and slowing down and making some effort to avoid the accident.
Defendants denied plaintiff's charge of negligence against the driver, Cesmer Gallien, and charged Sam Payton with negligence constituting a proximate cause or, in the alternative, a contributing cause, of the accident in that Sam Payton entered a public highway from a private road without yielding the right of way to approaching traffic, particularly to the truck driven by Gallien; that Payton drove from a point off of said highway concealed by weeds, brush and trees to such an extent that his truck could not be observed until it was in the intersection, and in his failure to stop and make proper observations before entering the highway or to maintain a proper lookout. As a further defense, defendant plead the doctrine of discovered peril or last clear chance, alleging that Sam Payton saw or could have seen the truck driven by defendant as it approached the intersection and while he, the said Sam Payton, was in a place of safety where he could have remained until Gallien's truck had passed and all danger averted.
From a judgment rejecting plaintiff's demands, plaintiff appealed.
The questions presented for determination are primarily two:
(1) Whether or not defendant Gallien's negligence was the sole and proximate cause of the accident or whether Payton was guilty of negligence proximately causing or contributing thereto, and
(2) Whether or not Payton's death was caused by the accident.
It is plaintiff's contention that the aforesaid action of Sam Payton in driving into the graveled highway did not create an emergency; that he had sufficient time to and did enter the highway, cross over into his right side thereof and clear the traffic lane for the approach of defendant's truck from the opposite direction, and that the accident was caused solely and only by Gallien's negligent failure to see the Payton truck until he was only 20 feet away, according to Gallien's own testimony, at which point and time he either wilfully or negligently crossed over the center of the road and struck Payton's Studebaker truck.
Defendants' theory is that Payton hurriedly spurted out of the private road into the graveled highway without time and opportunity for its driver to prevent the accident. While plaintiff alleged that the Gallien truck was approximately 220 feet away when Payton drove into the highway, testimony was admitted without objection that the truck was as far as 525 feet away. The exact distance is not very material. There is no substantial evidence that either vehicle was driven at an unlawful, reckless or excessive rate of speed. From our review of the record, we are convinced that defendants' truck was being operated at approximately 35 to 40 miles per hour, although defendants testified to a lesser speed, while others testified that the speed was much greater, and that the Payton truck, having to start from "stop", could not have gained any considerable speed within the distance traveled of approximately 40 feet.
Defendant Gallien admitted to W. D. Black, deputy sheriff, at the scene of and immediately following the accident that he did not see the Payton truck until he was within a distance of approximately 20 feet therefrom. His testimony given upon the trial is to the same effect. Gallien advances no reason in his testimony why he could not have sooner seen the truck prior to the accident and as it entered the highway. While the photographs offered in evidence show grass and weeds on the shoulder of the highway and on the right of way to and beyond the fence, the trees appear to be some distance back beyond the fence, the posts of which near the gap or gate can be clearly observed projecting above the mass of grass and weeds. Moreover, defendant Gallien was familiar with the traffic conditions at this point and knew of the traffic created by the contractor's fleet of trucks hauling sand, as well as the traffic to and from the sawmill. While it is the duty of the driver of a vehicle entering a public highway from a private road to yield the right of way to all vehicles approaching *578 on the public highway, the evidence conclusively establishes the fact that Payton had sufficient time and opportunity to and did drive upon the highway into the opposite lane thereon and cleared the lane for defendant's truck; that it was only after he had timely entered the opposite lane that defendant Gallien saw the truck and steered his own vehicle from its proper lane across the middle of the highway and into his left-hand lane of travel, where he struck the Payton truck. Payton successfully and completely negotiated the intersection and reached a place of safety on defendant's left-hand side of the highway prior to the approach of defendant's truck to said intersection.
In support of defendants' contention, counsel has cited the case of Strehle v. Giaise, La.App., 46 So.2d 685, 687, from which it was quoted:
"There is no doubt that the operator of an automobile who desires to drive from a private driveway onto a thoroughfare must be extremely careful to make certain that it is safe to do so. And if the car is being backed out upon the highway the operator must be even more careful.
"In Honeycutt v. Carver, La.App., 25 So.2d 99, 101, the Court of Appeal for the First Circuit said: `* * * It is the duty of a person backing out of a private driveway into a public highway to exercise great care, and ascertain if any traffic is approaching from either direction.'
"It is also true that as between an automobile on a private driveway and another on a public highway, the latter is entitled to the right of way. In Stroud v. Davis-Lawhead Funeral Home, 154 So. 476, 477, the Court of Appeal for the Second Circuit quoted with approval a statement from section 1024 of Berry on Automobiles, reading as follows: `* * * A vehicle on a public highway has the right of way over one emerging from private grounds.'"
With the principles therein stated we are in full accord; however, more appropriate to the facts here is Judge Janvier's further observation in that case, wherein he stated:
"Thus it seems probable that since the car of plaintiff was on the highway and obviously in view of defendant as he backed his car from the private roadway, defendant could easily have seen it had he looked as he says he did. However, even if we assume that defendant was at fault in backing out into the road without first making certain that it was safe for him to do so, it does not necessarily follow that he is liable for if, when he was in the road in the path of plaintiff's on-coming car, plaintiff could still have avoided him by exercise of proper care, the proximate cause of the accident must be held to have been not the negligence of defendant in creating the dangerous situation, but the carelessness of plaintiff in not avoiding the collision that could have been avoided by the exercise of care had he been on the alert.
"In Stroud v. Davis Lawhead Funeral Home, supra, this question is discussed, and again the Court quoted with approval from Berry on Automobiles, section 1024: `The fact that a car is being driven from a private driveway does not give the driver of a car on the public highway with which the driveway intersects, an absolute and unqualified right of way. Both drivers are under the duty to act reasonably.'"
Defendant also cites Bendish v. Roberts, La.App., 24 So.2d 688, 689. We fail to appreciate that the holding there supports defendants' position. After quoting Act 286 of 1938, Rule 3, Sec. 11(e), now LSA-R.S. 32:237, Section E, to the effect that the driver of a vehicle entering a public street or highway from a private road or drive shall yield the right of way to all vehicles approaching such public highway, the court stated:
"Nevertheless, we are of opinion that Roberts was negligent in failing *579 to keep a proper lookout and in driving too fast. He says he did not see the Bendish car until too late, but he should have seen it sooner and he must be held to have seen that which he could have seen. The great preponderance of the evidence is to the effect that the Bendish car entered the roadway when he was at least eighty feet away, consequently, if he had been looking ahead of him instead of over his left shoulder, he would have seen it obstructing his path and, if his speed was not immoderate he would have been able to stop in time to avoid the accident. We believe his negligence contributed to the accident."
This case and the case of Lofton v. Cottingham, La.App., 172 So. 377, likewise cited by defendant, are distinguishable from the case at bar on the facts involved, such as the excessive speed of the approaching cars and the entry of the other vehicle without sufficient time or opportunity to negotiate the intersection. It is recognized that the primary duty of avoiding a collision rests upon the driver of the vehicle entering a public highway from a private drive. He is required to keep a lookout for vehicles upon the favored street and must keep his car under control and exercise due care and caution. Payton complied with these requirements. His action must be considered in the light of the surrounding circumstances, and if the International truck was at such a distance away from the intersection of the plantation road as would suggest to the mind of a reasonably prudent person that the negotiation of the intersection might be undertaken without danger of collision, he was justified in doing so. His actions justify this conclusion in that he actually reached a place of safety on the opposite side of the highway, and, had it not been for Gallien's failure to observe Payton's truck until he was only 20 feet away, Gallien, by the exercise of due caution and by maintaining a proper lookout, could have continued on his right-hand side of the road and avoided the accident. Simpson v. Pardue, 15 La. App. 341, 131 So. 854; Synigol v. Oury, 17 La.App. 163, 134 So. 324.
In Herlong v. Arkmo Lumber Co., La. App., 53 So.2d 423, an automobile driver, who was traveling at a speed of 21 to 25 miles per hour and who had a clear view of the intersection, hit the right rear side of a truck which had approached the intersection from the left, traveling about 10 miles per hour and was just completing a turn at the intersection and which the driver had failed to see until just before the collision, was held negligent for failure to keep a proper lookout.
From the facts of this case, the conclusion is inescapable that the negligence of Cesmer Gallien was the sole and proximate cause of the accident and the injuries and damages resulting therefrom and that Payton was free from negligence proximately causing or contributing to said accident.
The question of causal connection between the accident and Payton's death is our next concern. Plaintiff's principal demand is for damages for the death of Sam Payton, who was afflicted with a heart ailment. It is contended that the impact of the collision wrought both physical and nervous injuriesbruises and contusions over his bodyand a fracture of the transverse process of the fourth lumbar vertebra and produced in him a state of shock which accelerated his heart ailment and caused his death the day following the accident. On the contrary, defendants claim that Payton died solely from natural causes without any precipitation or acceleration by the accident.
Plaintiff introduced the testimony of Drs. R. S. Roy and W. H. Pierson. No medical evidence was offered by defendants. Dr. Roy on direct examination stated:
"* * * it is my opinion that the man died of a heart attack and it could have been very easily aggravated by the collision, the suspense and the pain through which he went. The type of heart trouble from which Sam was suffering *580 was one which nervous tension, exercise, bodily injury or anything of that sort might have aggravated. My opinion is that the wreck might have precipitated the attack which caused his death."
Then followed the testimony of Dr. Roy as elicited under cross-examination:
"Q. Doctor, the fact that the accident occurred about 3 p. m. one afternoon, after which the deceased stood around the scene of the accident for more than an hour, was brought in to the hospital and examined by a doctor, then taken home after x-rays had been taken, returned by car the next day to the doctor's office, then went to a motor company, got in an automobile and drove a short distance, would you not say that the heart attack and death could have been caused by the slight exercise the next day? A. I would hardly think that if he had been accustomed to driving his car. I think that the accident, with its sequelle, was the cause of the heart attack.
"Q. Would that have been expected to have brought on his death within an hour or two after that? A. Not necessarily. We often have patients who die of a heart attack when they go to the bathroom in the morning when actually the thing that actually precipitated the death was exercise or overindulgence the day before.
"Q. Isn't it also true that driving a car the day of the accident might have had the same effect? A. That's hypothetical, of course. Any exercise could cause it but the presumption is that he had gone through a whole lot more in this wreck than he would have in driving his car.
"Q. With the type of heart he had the slightest exercise could have brought it on, couldn't it? A. Almost anything.
"Q. The doctors cannot, on the facts as shown by the autopsy, fix the cause exactly as this wreck. A. No, sir, they sure cannot."
Dr. Pierson, who was Payton's family physician and who had been treating him for his heart ailment for almost a year, said Payton had shown improvement during the period of his treatment. On the afternoon of the accident, the Doctor examined Payton at a local sanitarium in Natchitoches and made X-rays in connection therewith, which revealed that plaintiff sustained, among other injuries, a fracture of the transverse process of the fourth lumbar vertebra on the left. The Doctor's opinion was that Payton suffered moderate severe pain in that area. Payton was treated for shock and, on his insistence, was permitted to return to his home. Payton was fairly quiet, shocked, but not in a nervous state. The Doctor admitted, however, in his testimony that his appreciation of the extent of Payton's injuries was incorrect and intimated that had he fully realized Payton's condition he would not have permitted him to return home. However, Payton returned to Dr. Pierson's office the next morning and was again examined. As to his condition, as found on that examination, and as to the effect the accident had on bringing on Payton's death, the Doctor testified:
"Q. What did you find? A. He was, of course, considerably bruised all over and complaining of pains more or less of a general nature, though his general physical condition was fairly good. His heart and blood pressure were about as good as they had been previous to it.
"Q. Doctor Pierson, as Sam Peyton's physician, who knew his condition for some months before the accident, and that he had improved before the accident based upon the knowledge that he had suffered a blow sufficient to fracture a portion of his back bone and to give him a considerable shock, in your opinion, did the accident in which he was involved aggravate the heart condition to the point where death resulted? A. It did not manifest itself *581 immediately but I have more or less come to the conclusion that it did have something to do with the final outcome. Certainly, an individual with a heart in the condition that Sammy Payton's was, any shock would be expected to affect it unfavorably, though at the time I examined him his shock apparently was not severe and I didn't think it would affect the outcome or future course of his heart ailment to the extent that it did.
"Q. Is it not a fact that a heart in the condition his was in is more affected by stimulae caused by excitement and shock than physical injury? A. Definitely so, yes.
"Q. Just clinically, what was your opinion as to the cause of death? A. I (he) had acute left ventricular failure I think sudden dilitation of it.
"Q. Is it your opinion that there might have been arrythmia? A. O, yes, that's indicated by the autopsy report. According to Doctor Matthews, it is perfectly possible that that could have been the case. I think it was of short duration, probably just a few minutes before he died, if it did occur.
"Q. Is it your opinion that that particular failure can be, or probably was, caused in this case by the shock that he had had? A. It can be, yes.

* * * * * *
"Q. Doctor Pierson, you tested his blood pressure and heart on the afternoon that Payton came in after the accident? A. Yes, sir.
"Q. You testified that it was no different from what it had been on prior examinations. A. Previous to that there was no great difference. Actually, I had taken his blood pressure on many occasions when it would vary 20 to 30 points. He had that type of heart in which it fluctuated and it was not enough to cause me to believe he was in any shock on the day after.
"Q. Right after the day of the accident? A. The blood pressure was lower which is evidence of some shock.
"Q. What did you prescribe? A. That he go home and rest. We had given him a sedative at the hospital.
"Q. Now, he came back the next day. Was that at your instructions? A. Yes.
"Q. You made further tests at that time? A. Yes, sir.
"Q. And there was nothing in his condition then to warrant any special treatment? A. No, nothing to cause particular alarm.
"Q. Was the type of heart Payton had one that could cause his death with the slightest type of exercise? A. Yes, that's true.
"Q. A while ago on direct examination, did I understand you to say something about his death indicated exercise or excitement a few minutes before his death? A. No, I said he might have had arrythmia a few minutes before.
"Q. What is arrythmia? A. Disturbance of the rhythm of the heart beat.
"Q. As I understand it, it cannot be said, with any certainty, that Sam Payton's death was caused by this accident which happened the day before his decease? A. No, sir.

* * * * * *
"Q. You testified that it was probably the cause of his death, didn't you? A. I would think it contributed to it, yes.
"Q. If it was not the cause of death, there was a very strong coincidence, wasn't there? A. Yes, sir."
The question presented, therefore, is whether or not by this testimony a causal connection has been established between the accident and the injuries and shock sustained by decedent therein and the fact of his death.
*582 In Marks v. Highway Ins. Underwriters, La.App., 51 So.2d 819, one of plaintiffs, Mrs. Mamie S. Burke, sought damages occasioned by the death of her husband for injuries sustained September 24, 1949, in a bus on which he was riding as a fare-paying passenger colliding with a truck. Burke died 24 days following the accident with bronchopneumonia listed as the immediate cause of death. He had been in ill health for several weeks prior to the accident and had not worked since the previous month of July. During that period he had been treated by Dr. Cassity, mainly for a nervous breakdown. According to Dr. Cassity's testimony, Burke was nervous, upset, prostrated, and generally weak, and the treatment administered consisted of the use of heavy intravenous shots of vitamin B-1 complex and tonics, which had resulted in a considerably improved condition. In the accident Burke was struck on the left side, hip and back, and for treatment he was first admitted to the Minden Sanitarium, where he remained for 13 days, after which he was permitted to return to his residence, where his condition grew worse. He was then admitted to the Shreveport Charity Hospital and from there transferred to the Veterans Administration Hospital at North Little Rock, Arkansas, where he arrived October 18 and died on the night of October 21, 1941. In discussing his death, this court stated:
"Dr. C. M. Baker, who attended Mr. Burke at the Minden Sanitarium, testified that the injury he sustained was likely to make him more susceptible to local infection and to acute specific infectious diseases and that his injury could have played a `big part' in his death. Dr. Cassity, who treated Mr. Burke prior to the injury and who saw him after the injury and before he was carried to the Charity Hospital, testified that the injury could `have been an active cause of his death, or may have been a contributing cause.' The District Court found that the medical testimony preponderated in favor of the conclusion that Mr. Burke's death was the result of his injuries, though its immediate cause was pneumonia. Under the circumstances disclosed by the record, we find that the accident was a contributing cause of his death, and that his widow should recover even though his general weakened condition prior to the accident and the subsequent pneumonia were also important contributing factors to the chain of events that resulted in Mr. Burke's death."
In a similar case styled Shaffer v. Southern Bell Telephone & Telegraph Co., 184 La. 158, 165 So. 651, 654, the Supreme Court had for resolution the question of whether Mrs. Shaffer's death was caused by the injury sustained in the accident or due to a previously existing bodily disease. In reviewing and commenting upon the testimony offered in support of plaintiff's contention, the court stated:
"At one point in his examination, Dr. Mattingly was asked the following question: `Q. Do you know what caused Mrs. Thomas Shaffer's death?' * * * `A. To say the exact cause of her death, not seeing her, I believe would be asking a little too much.' The court then asked the following question: `Q. Then you don't know, would you say that, Doctor?' The answer of the witness was: `A. I don't knowas to this accident, I predicted' Before the witness could complete his answer defendants' counsel interposed the following objection: `I object to the reason being stated.' And the court held that the objection was good. In our opinion, that isolated statement of the witness is not sufficient to support defendants' contention that the witness did not know the cause of Mrs. Shaffer's death, particularly as the witness was prevented by the objection of defendants' counsel from explaining his statement.
"In appraising its effect, testimony must be considered as a whole. The true meaning of the answers of a witness to isolated questions must be ascertained by considering all the questions *583 propounded to the witness and his answers thereto.
"Clearly, the particular statement of the witness now under consideration cannot be construed to mean that the witness did not know the injuries received by Mrs. Shaffer were the contributing cause, if not the direct cause of her death. And taken as a whole, his testimony shows that, in his opinion, Mrs. Shaffer's death was due to the injuries which she received in the accident caused by the negligence of the defendant company's employee. We have referred to and quoted some of his testimony on that point. At another place in his testimony, Dr. Mattingly stated that the injuries suffered by Mrs. Shaffer increased the load on her heart, which was in the condition to be found in any normal woman of her age, but that in his opinion her injuries with the resulting changes were sufficient to have caused her death, notwithstanding any existing heart condition. He was asked the direct question: `Q. Dr. Mattingly, in your opinion, would her (Mrs. Shaffer's) injury have been sufficient to cause death, even though she had no myocardiac condition at all?' And his answer was: `A. I would say that her condition, the condition present, was serious enough to cause death, taking Mrs. Shaffer as a normal woman at fifty-nine years of age.'
"While the certificate of Dr. Danos, which we have hereinabove quoted, shows that in his opinion, apparently formed after professional attention of only twenty minutes, the principal cause of Mrs. Shaffer's death was a certain diseased bodily condition which he set forth, it also shows that the contributing cause of death was the injury that Mrs. Shaffer had received in the automobile accident which had occurred three months before. Any other interpretation of the wording of the certificate would be wholly inconsistent with the proved facts and with reason and common sense as applied to other credible evidence."
In further expressing its conclusions, the court continued:
"The record satisfies us that the accident in which she was injured was the cause of Mrs. Shaffer's death. That is so whether her death was caused directly by the injuries which she received in the accident or whether her death was due to a previously existing bodily disease accelerated to a mortal end and sooner than otherwise it would have come.
"In Behan v. John B. Honor Co., 143 La. 348, at page 351, 78 So. 589, 590, L.R.A.1918F, 862, this court said: `But it is well settled in the jurisprudence elsewhere that the fact that a person was already afflicted with a dormant disease that might some day produce physical disability is no reason why he should not be allowed damages or compensation for a personal injury that causes the disease to become active or virulent and superinduces physical disability.' Citing Hilliard v. Chicago City Railway Co., 163 Ill.App. 282; Larson v. Boston Elevated Railroad Co., 212 Mass. 262, 98 N.E. 1048.
"In Hooper v. Standard Life & Accident Ins. Co., 166 Mo.App. 209, 148 S.W. 116, it was held that: `Where a man is so afflicted that he will die from such affliction within a very short time, yet if, by some accidental means, his death is caused sooner, it will be a death from "accident," within the meaning of the terms of an accident insurance policy.'
"There can be no doubt such is the law, because it has been adopted by practically every court which has had occasion to pass on the question. And it follows, of course, that if a pre-existing disease brought to a crisis by accident authorizes a recovery for personal injuries resulting from the accident it also authorizes a recovery from death resulting from the accident."
*584 In an action for workmen's compensation for the death of an employee who overexerted himself in attempting to close a valve on machinery under his supervision and who suffered a disabling heart attack one month later and a fatal attack 10 months thereafter, it was held that the evidence supported a finding of causal connection between the overexertion, the disabling heart attack and the fatal attack. Sharp v. Esso Standard Oil Co., La.App., 72 So.2d 601. In a similar proceeding for workmen's compensation, where the employee sustained accidental injuries August 13, 1952, followed by a paralytic stroke on November 7, 1952, the evidence likewise justified a finding of causal connection between the accident and the paralytic stroke. Smith v. International Paper Co., La.App., 73 So.2d 652.
The jurisprudence is well settled in this state that the duty of care and of abstaining from injuring another is due to the sick and the weak and infirm equally with the healthy and strong, and when there is a violation of that duty the measure of damage is the injury inflicted, and if a pre-existing disease is brought to a crisis by negligence, a recovery for personal injuries resulting therefrom is authorized against the wrongdoer as well as recovery for death resulting from the accident. Lapleine v. Morgan's Louisiana & Texas Railroad & Steamship Company, 40 La.Ann. 661, 4 So. 875, 1 L.R.A. 378; Shaffer v. Southern Bell Telephone & Telegraph Co., supra.
This jurisprudence is in accord with the general rule stated in 16 Am.Jur., page 58, under the title "Death", Section 78:
"* * * according to the weight of authority, the accepted view is to the effect that one who, by his wrongful or negligent act or default, accelerates a diseased condition, thereby hastening and prematurely causing the death of the diseased person, cannot escape civil liability, even though the disease would probably have resulted in death at a later time without his agency. If the negligence or other tortious act of the defendant was the proximate cause of the death, the fact that the weak physical condition of the deceased contributed in a measure to his death does not affect the defendant's liability."
This rule is stated in 25 C.J.S., § 25, pp. 1093-1094, under title "Death", in this language:
"To sustain an action for death the wrongful act, neglect, or default must have been the proximate cause of the death. It need not have been the sole cause of death; it is sufficient if it is the proximate cause of death although another cause, not amounting to an intervening independent cause, contributes thereto or hastens it, as where death results from a disease which was caused by the injury, or where the injured person is subjected to unskillful or improper surgical or medical treatment. It is likewise sufficient if the injuries received as a result of defendant's wrongful act, superimposed upon an existing condition, proximately cause death, as where they hasten death from a prior disease, or render a prior disease fatal. It need not even have been the sole proximate cause, for if it is one of a number of concurring causes, in the absence of either of which death would not have resulted, defendant's liability attaches."
The burden of proof rests upon plaintiff to establish by a preponderance of the evidence that the injuries produced by the accident caused or accelerated the death of Sam Payton. We are satisfied from the record that plaintiff has sustained this burden of proof. It makes no difference whether his death was caused by the injuries received in the accident or whether it was due to a previously existing bodily disease accelerated to a mortal end and sooner than otherwise it could have come.
For the reasons assigned, defendants should respond in damages to plaintiff. There is no evidence in the record as to the deceased's income or what amounts he contributed to the support of his family. However, there is evidence that he lived *585 an active life and at the time of the accident he owned and operated a small sawmill, manufacturing railroad ties. From this it can be safely concluded he was supporting his family. Payton was approximately 50 years of age and his surviving minor daughter was 17 years of age.
It was stipulated that as for personal injuries and death of one person sustained in an accident a maximum of $10,000 therefor was provided in the policy issued by the Great American Indemnity Company covering the truck of the Department of Highways and operated at the time by its driver, Cesmer Gallien.
Supporting her claim for an award of substantial damages, plaintiff cites the following cases:
Alford v. Louisiana & Arkansas Railway Co., 38 So.2d 258, wherein this court sustained an award of $10,000 to a surviving widow and $5,000 to each of three minor children on account of the death of the husband and father, who was 48 years of age and had a life expectancy of 22 years and was earning $215 to $225 per month;
Bergeron v. Saia, 37 So.2d 866, wherein the Court of Appeal for the First Circuit awarded the surviving widow $10,000 and each of three minor children $2,500 for the death of the husband and father, aged 42 years, who was earning $240 per month, where the principal defendant was a person of limited means and whose insurance coverage was limited to the amount of $10,000;
Short v. Central Louisiana Electric Co., Inc., 36 So.2d 658, wherein this court sustained an award of $15,000 to a surviving widow for the death of her husband for loss of companionship and support, and
Tolle v. Higgins Industries, Inc., 212 La. 173, 31 So.2d 730, wherein the Supreme Court approved an award of $12,000 to a surviving widow and $7,000 to a minor child for the death of her husband and father, 60 years of age, who had a life expectancy of 14 years, and had a substantial earning capacity.
In the cited cases no contention or showing was made that the deceased parties were suffering from any disease, ailment or infirmity that might have detracted from their chances of living out their normal life expectancies. Such was not the situation here. Payton was already suffering from and afflicted with a serious heart ailment which materially affected his activities and no doubt his income. Whether or not, but for the accident, he would have lived out his period of life expectancy is problematical, beyond the realm of human power to foretell. At the best, it was not likely.
While the actual damages suffered by plaintiff and daughter are not clearly established by the evidence, yet taking into account all the facts and circumstances of this case, as disclosed by the record, we think an award of $5,000 to the surviving widow and an award of $3,000 to the minor daughter are adequate for the loss of the love, society and companionship, as well as for the support of their aforesaid husband and father and for his pain and suffering. The damages to the truck and the expenses for the professional care and treatment of the deceased and for his funeral expenses were stipulated to be $830.16.
For the reasons assigned, the judgment appealed is annulled, avoided, reversed and set aside and there is now judgment in favor of Leoyou Payton individually for the full sum of $5,830.16, and in favor of Leoyou Payton as natural tutrix for the use and benefit of her minor daughter, Pauline Payton, for $3,000 and against the Great American Indemnity Company and Cesmer Gallien, in solido, with 5 percent per annum interest on both of said sums from judicial demand until paid, and for all costs of this suit.
Reversed and rendered.
GLADNEY, Judge (dissents).
I respectfully dissent from the ruling of the majority of the court, being of the opinion that Sam Payton was guilty of concurrent negligence.
*586 According to Deputy Sheriff W. D. Black, immediately following the accident Payton told him he saw the oncoming truck but thought it was going into the pasture because he had observed several trucks hauling sand out of the pasture. This unwarranted assumption on the part of Payton was his motive for peremptorily driving directly across the road. It so happened that the oncoming truck was not going into the pasture, but going straight up the road. Then the accident could not be avoided. Regardless of whether we conclude Gallien, driver of the International truck, did or did not see Payton until the two trucks were twenty feet apart, and was thereby guilty of negligence, the evidence is conclusive, in my opinion, that Payton crossed in front of the International truck when it was unsafe to do so. It is clear to the writer that Payton was guilty of such negligence as should bar recovery.

On Motion for Rehearing
PER CURIAM.
In a motion for a rehearing attention was directed to the fact that the minor, Pauline Payton, in whose favor judgment was rendered herein through Leoyou Payton as natural tutrix, has become of the full age of majority and, on motion, was made a party plaintiff in her own right. Accordingly, the said Pauline Payton, to the extent of her interest in said judgment, is made, recognized and substituted as a party plaintiff, and, as thus amended, the judgment originally rendered herein is reinstated and made the final judgment of this court.
Rehearing denied.
GLADNEY, J., dissenting.