# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**23-750**


**CYNTHIA SONNIER, ET AL.**

**VERSUS**

**WILLIAM BOOTHE AND
USAA GENEAL INDEMNITY COMPANY**


**\*\*\*\*\*\*\*\*\*\***

WRIT FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 90893
HONORABLE CURTIS SIGUR, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## VAN H. KYZAR
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of D. Kent Savoie, Van H. Kyzar, and Guy E. Bradberry, Judges.


**WRIT GRANTED AND
MADE PEREMPTORY.**

**Nicholas R. Rockforte**
**Derrick G. Earles**
**David C. Laborde**
**Laborde Earles Law Firm, LLC**
**P.O. Box 80098**
**Lafayette, LA 70598-0098**
**(337) 261-2617**
**COUNSEL FOR RELATORS:**
    **Cynthia Sonnier, Joni Castille, Cody Sonnier, Rusty Sonnier,**
    **and Dusty Sonnier**

**Michael M. Thompson**
**Jordan L. Faircloth**
**Hannah C. Catchings**
**Taylor Wellons Politz & Duhe**
**4041 Essen Lane, Suite 500**
**Baton Rouge, LA 70809**
**(225) 387-9888**
**COUNSEL FOR RESPONDENTS:**
    **William Boothe**
    **USAA General Indemnity Company**

**KYZAR, Judge.**

Relators seek a supervisory writ to review the judgment of the trial court granting a motion for partial summary judgment in favor of Defendants and dismissing their wrongful death claims concerning their father. For the following reasons, the writ is granted and made peremptory, reversing the partial summary judgment, and denying Defendant's' motion.

## FACTS AND PROCEDURAL HISTORY

This case arises out of a motor vehicle accident. On September 23, 2020, Joseph Sonnier (Mr. Sonnier) was rear-ended on the Basin Bridge on I-10 by William Boothe, who was operating a large truck and trailer. Mr. Sonnier sustained serious injuries as a result of the accident. He then died of a heart attack during the course of his treatment.

On September 8, 2021, Mr. Sonnier's six children, Cynthia Sonnier, Joni Castille, Cody Sonnier, Rusty Sonnier, and Dusty Sonnier (referred to collectively as "Relators"), each filed a Petition for Wrongful Death and Survival Action against Mr. Booth and his insurer, USAA General Indemnity Company (collectively referred to as "Defendants"). On August 16, 2023, Defendants filed a motion for partial summary judgment, seeking dismissal of all six wrongful death claims.

On October 4, 2023, the motion for partial summary judgment was presented and argued before the trial court. Thereafter, the trial court issued written reasons for judgment on October 26, 2023, granting Defendants' motion and dismissing Relators' wrongful death claims. The judgment further sustained Defendants' objection to the affidavits of Relators' expert cardiologist, Dr. David A. Mulhearn, IV, and thus did not consider them. The original affidavit was filed timely, and the supplemental affidavit was filed just before the hearing on the motion. On November 27, 2023, Relators filed a notice of their intent to seek supervisory writs. They further

filed a Motion to Vacate Judgment/Motion for Reconsideration of the Granting of Defendants' Motion for Partial Summary Judgment, which was set for hearing on January 24, 2024. We held consideration of the writ application in abeyance pending a decision on the motion to vacate. The motion to vacate and reconsider was denied. As a result, the issue of the correctness of the partial summary judgment dismissing the Relators' wrongful death claims is now directly before us.

## DISCUSSION

The question before us is whether Defendants are entitled to summary judgment dismissing Relators' claims for the wrongful death of their father from a heart attack allegedly caused by or hastened as a result of the injuries he suffered from the motor vehicle collision.

We review the decision to grant or deny a motion for summary judgment *de novo*, using the same criteria as the trial court. *Smitko v. Gulf S. Shrimp, Inc.*, 11-2566 (La. 7/2/12), 94 So.3d 750. Louisiana Code of Civil Procedure Article 966 provides, in part, that either "party may move for a summary judgment for all or part of the relief for which he has prayed[;]" and the motion "shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(1), (3). While the burden of proof is on the mover:

> [I]f the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

La.Code Civ.P. art 966(D)(1).

2

Our courts have long been faced with cases involving deaths connected with, but not directly caused by, injuries suffered from accidents. In *Walker v. Joseph P. Geddes Funeral Service, Inc.*, 33 So.2d 570, 572–73 (La.App. Orl. Cir. 1948) (third alteration in original), the court discussed the recovery for wrongful death caused or hastened by injuries received as a result of tortious conduct:

> Lily Walker suffered the stroke on January 31, 1943, and her condition was considered by Dr. Querens as "very grave." She was mortally ill when placed upon the stretcher by defendant's employees, but notwithstanding her debility the defendant owed her the duty of safely transporting her in its ambulance. The law is well settled that the duty of care and of abstaining from injuring another is due to the weak, the sick and infirm equally with the healthy and strong, and when there is a violation of that duty the measure of damage is the injury inflicted, and if a pre-existing disease is brought to a crisis by negligence, a recovery for personal injuries resulting therefrom is authorized against the wrongdoer, as well as a recovery for death resulting from the accident. Lapleine v. Morgan's L. & T. R. & S. S. Co., 40 La.Ann. 661, 4 So. 875, 1 L.R.A. 378; Shaffer v. Southern Bell Telephone & Telegraph Co., et al., 184 La. 158, 165 So. 651, 655. In the latter case the Supreme Court said:
>
> "In Behan v. John B. Honor Co., 143 La. 348, at page 351, 78 So. 589, 590, L.R.A.1918F, 862, this court said: 'But it is well settled in the jurisprudence elsewhere that the fact that a person was already afflicted with a dormant disease that might some day produce physical disability is no reason why he should not be allowed damages or compensation for a personal injury that causes the disease to become active or virulent and superinduces physical disability.' Citing Hilliard v. Chicago City R. Co., 163 Ill.App. 282; Larson v. Boston Elevated R. Co., 212 Mass. 262, 98 N.E. 1048.d["]
>
> "In Hooper v. Standard Life & Accident Ins. Co., 166 Mo.App. 209, 148 S.W. 116, it was held that: 'Where a man is so afflicted that he will die from such affliction within a very short time, yet if, by some accidental means, his death is caused sooner, it will be a death from "accident," within the meaning of the terms of an accident insurance policy.'["]
>
> "There can be no doubt such is the law, because it has been adopted by practically every court which has had occasion to pass on the question. And it follows, of course, that if a pre-existing disease brought to a crisis by accident authorizes a recovery for personal injuries resulting from the accident it also authorizes a recovery from death resulting from the accident."
>
> . . . .

3

See also Meekins v. Norfolk & S. R. Co., 134 N.C. 217, 46 S.E. 493, where it was held that recovery might be had for a death if the cause was a disease but the disease was accelerated and death hastened by the negligent act of the defendant.

In San Antonio Public Service v. Mitchell, et al., Tex.Civ.App., 238 S.W. 265, 267, we find the following language: "If, as the jury must necessarily have found, the injury to Mrs. Mitchell so weakened her powers of resistance to the attacks of the tuberculosis germs that they seized upon and destroyed, or impaired, her lungs, and thus hastened her death, then the proximate cause of her death was the negligence of appellant. * * *"

The burden rested upon plaintiff to prove that the injuries resulting from the fall caused or accelerated the death of Lily Walker.

While it is noted that the court in *Walker* concluded that there could be no recovery for the wrongful death of the decedent, its reasoning was based on the evidence presented by the defendants after a trial on the merits, not pursuant to summary judgment as is the case here.

In *Payton v. Great American Indemnity Co.*, 83 So.2d 575, 579 (La.App. 2 Cir. 1955), the plaintiff's husband died of a heart attack the day after an accident:

The question of causal connection between the accident and Payton's death is our next concern. Plaintiff's principal demand is for damages for the death of Sam Payton, who was afflicted with a heart ailment. It is contended that the impact of the collision wrought both physical and nervous injuries—bruises and contusions over his body— and a fracture of the transverse process of the fourth lumbar vertebra and produced in him a state of shock which accelerated his heart ailment and caused his death the day following the accident. On the contrary, defendants claim that Payton died solely from natural causes without any precipitation or acceleration by the accident.

As to the plaintiff's burden of proof to establish that the heart attack was causally related to the injuries he suffered in the accident, the court held:

The burden of proof rests upon plaintiff to establish by a preponderance of the evidence that the injuries produced by the accident **caused or accelerated the death** of Sam Payton. We are satisfied from the record that plaintiff has sustained this burden of proof. It makes no difference whether his death was caused by the injuries received in the accident or whether it was due to a previously existing bodily disease accelerated to a mortal end and sooner than otherwise it could have come.

4

*Id.* at 584 (emphasis added).

The question here is no different than that before the court in *Payton*. However, we must view the burden of proof as to the cause of the heart attack under the microscope of the summary judgment analysis. Accordingly, we consider the admissible submissions presented in support of Defendants' motion to first determine whether they presented evidence sufficient to establish that there are no genuine issues of material fact, and that Relators will be unable to establish one or more of the elements of their burden of proof at trial. La.Code Civ.P. art. 966(D)(1).

Defendants rely heavily on the testimony of Dr. David Homan, a cardiologist, in support of their motion, as did the trial court. However, a review of Dr. Homan's testimony shows this court, without doubt, that there are existing issues of material fact about the cause of Mr. Sonnier's heart attack and whether the stressors exerted upon him by the accident and the injuries he suffered therein, at the least, precipitated his heart attack.

Dr. Homan initially opined that Mr. Sonnier's heart attack was not caused by the injuries related to the accident, thus seemingly supporting Defendants' position:

> Q.  I know you haven't seen everything. Just a blunt question, and it may sound silly to you, but this is the world we live in. Based on everything you've seen, we've discussed, and everything we've talked about, can you correlate an automobile accident from September of 2020[,] to this man's heart attack of February 5, '21?
>
> A.  No.
>
> Q.  Is there anything that you'd like to see that might help you confirm, verify that, or say no, there's no way?
>
> A.  I can't imagine what evidence I could see that would make me think the two are connected.

While Dr. Homan initially posited the opinion that the accident had no bearing on Mr. Sonnier's heart attack, he later added critical testimony during cross

5

examination relative to the disputed issue of stress as a potential impact factor in his heart attack:

Q.  I took some time to do a research [sic], and I want to ask you some questions about mental stress and its effects on the cardiovascular system or its potential to trigger an MI. And what I want to hand you first, this is an article from -- yeah, you can see it.

That's a study from JAMA titled, "Association of Mental Stress-Induced Myocardial Ischemia With Cardiovascular Events In Patients With Coronary Heart Disease." I think that the first — I guess I'll walk you through a couple of sections here that I thought were useful, at least in terms of my research.

So it says, "Important: Mental stress-induced myocardial ischemias are recognized phenomenon in patient [sic] with coronary heart disease." And then it looks at results of some studies and talks about in this particular study were 918 patients in the sample pool. I'm looking under the results section.

A.  Uh-huh.

Q.  "Of those, 147 patients, 16 percent had mental stress-induced ischemia; 281, 31 percent, had conventional stress ischemia." And then it looks back down a couple of lines below and says that the mental stress-induced ischemia was statistically significant of a -- with a significantly increased risk.

And in its conclusion of the article was down at the bottom, "The presence of mental stress -induced ischemia compared with no mental stress-induced ischemia was significantly associated with an increased risk of cardiovascular death or non-fatal myocardial infarction." It has a whole host of similar articles, and I just wanted your thoughts on this phenomenon about the mental stress aspect of how that may cause an MI if it would.

MR. THOMPSON:

Let me object. This is not a phenomenon. There's 16 percent correlation at best under the study. Subject to the objection, you can answer.

MR. ROCKFORTE:

Q.  Well, the study does show, Doctor, does it not, that it is the only statistically significant result there whereas the conventional stress ischemia side of it is not shown to be significantly increased risk [sic], at least as this study shows, correct?

6

A.  You know, I actually would want to read through the whole thing --

Q.  Yeah, sure.

A.  -- to tell you whether I thought that was true or not.

Q.  And this -- I'm just using this as a dialing off point to ask you your opinions about this situation, and really, the situation of whether mental stress and how it can cause or contribute [to] myocardial infarctions.

A.  Yeah, so the challenge I would imagine would be quantifying that in some way. Certainly mental stress, psychological stress can increase high blood pressure. It can increase I would say overall, like, just adrenaline in the system. All of those things can potentially increase the wear and tear on the heart. Whether the two are directly correlated, though, I'm not aware.

Q.  We hear the common people say, "You need to slow it down or you're going to give yourself a heart attack." You've heard that old adage.

A.  Yeah.

Q.  Is that true?

A.  So I think you're hard-pressed to find a cardiologist, and I tell patients this all the time, that'll sort of advocate decreasing physical activity. Most cardiologists are going to advocate for increasing physical activity. So the heart responds quite well to physical activity.

    Now, if somebody is in the middle of, you know, an event, that's probably not the right time to be exercising, but --

Q.  Right. And I think were [sic] kind of off track here. What I'm talking about is mental stress.

    If someone is experiencing severe mental stress, is that something as a cardiologist that you would take into your tool bag and say, "Look, you need to cut back on some of these stressors. I think you can have improved cardiovascular health if you cut back on some of these stressors in your life." Is that something that you have in your toolbox that you use to discuss with your patients?

A.  Yeah, I mean, it depends on what the trigger is for the stressors when you're saying stressors.

7

While an objection was made during the deposition, no such challenge was made during the hearing on the motion, and we find nothing objectionable to the line of questioning or the phraseology of the question.

The following colloquy appears further in Dr. Homan's deposition:

Q. And so long way of saying it, it is possible that someone can have increased stress that increases their heart rate, increases their blood pressure that can cause or contribute to a heart attack; is that true?

A. Yes.

Q. And so as you sit here today, you can't rule out and say, "Well, this gentleman was not having enough stress to increase his heart rate or to increase his blood pressure such that it contributed." You can't rule it in or out, can you?

A. Correct.

On re-direct examination, an attempt was made to minimize the previous testimony about stress as a factor in heart attacks:

Q. Have you seen or been presented with anything that would lead you to believe that stress caused or contributed to the heart attack of this gentleman in this case?

A. No.

. . . .

Q. He's asking you these questions because what he wants to say is that because it started after the automobile accident, the chest pain must be caused by the car accident and this myocardial infarction. Is there any evidence to suggest that if someone develops chest pain and subsequently dies of a heart attack that we can correlate the time frame from some kind of trauma to say yes, that's why they had that?

A. No.

. . . .

RE-EXAMINATION BY MR. ROCKFORTE:

Q. Is there -- do you have any evidence to confirm that Mr. Sonnier had a heart attack due to a blockage?

8

A.   No.

Dr. Homan admitted that there was no evidence of a blockage-induced heart attack in the medical records and that other factors could have been a cause for the heart attack:

RE-EXAMINATION BY MR. THOMPSON:

Q.   But the most likely explanation is a blockage, agree?

A.   I would agree with that.

MR. THOMPSON:

Thank you.

RE-EXAMINATION BY MR. ROCKFORTE:

Q.   Doctor, MIs are multi-factorial, are they not, in terms of potential causes?

A.   Yeah.

Q.   And you can have multiple potential causes and contributing factors that could contribute to an MI, true?

A.   Yes.

Considering Defendants' evidence, we find that it is equivocal at best and does not foreclose Relators' ability to prove that Mr. Sonnier's heart attack was caused by the physical and mental stress he suffered as a result of the injuries from his accident. However, even assuming arguendo that it does, Relators' submissions in opposition to the motion establish the existence of genuine issues of material facts as to whether Mr. Sonnier's heart attack was caused by or at least precipitated by the accident and injuries he suffered therefrom.

Relators introduced the deposition of Dr. Jayme Trahan, Mr. Sonnier's treating neurosurgeon, in opposition to the motion. Therein, the following colloquy appears, related to the issue of causation of the heart attack:

9

Q. Well, I'll just cut to the chase here. You saw him as a result of an automobile accident that he was in on September of 2020, a rear-end collision, correct?

A. Yes, September 23rd.

. . . .

Q. Was that heart attack due to the car accident from several months prior?

MR. ROCKFORTE:

Object to the form. You can answer, Doctor.

A. So whenever you undergo stresses in your life, whether it's trauma, whether it's environmental stresses, it, from a medical standpoint, exacerbates underlying comorbidities.

MR. THOMPSON:

Q. So the stress from the car accident you think caused his heart attack?

A. I think it's -- I think it's possible.

. . . .

Q. So, again, I mean, the reason that I am here and this is an issue is because the Sonniers [sic] claim that this all happened and is a result of the car accident in September of 2020. And the only way you can link it up is stress; is that correct?

A. That's the only physiologic way that I can link it is that, you know, stress placed upon an individual by either a new event or an upcoming procedure or fill in the blank. Any physiologic stress.

That's the only way I can, link it. I stated it at the beginning. I'll state it at the end. If a cardiologist disagrees with me, he is the authority on this matter. He is the expert in the field of cardiology. I am neurosurgeon.

But, you know, if you ask me, is it plausible, yeah, it's very plausible. As far as the probability, I would have to defer to the cardiologist.

Q. But just to finish it up, you also see where documentation of other -- if we're talking about stress, that's any stress in one's life if you have heart problems can cause you to have issues.

10

A. That's correct.

Q. And we see other stressors that he himself is reporting to his chiropractor, correct?

A. Yes, you showed me a note talking about a hurricane.

The deposition of Mr. Sonnier's daughter, Joni Castille, was submitted, wherein she described her father's condition in December prior to his death: "He was nauseated every day. His neck hurt. His back hurt. He had no strength. It just — it was basically, watching him deteriorate before my eyes." She went on to relate events that occurred on the same day as Mr. Sonnier's death:

> So, I looked over at him. I said, "Dad, you're good?" And he's like, "I can't talk right now. I'm having an episode." And I knew what he meant, when he said "I'm having an episode", so I'll elaborate what that meant. Nausea, pain, can't catch his breath, just pale. He always felt like he was going to throw up. And he had it so regularly, that he named them "episodes". That's how often he had it. He was like, "I'm having another episode." It happened like three times on the way to the — on the way to the surgical center.

She testified directly that the stress that her father experienced was a factor in his death:

> Q. I want to back up a little bit before we get into the impact that the accident had on him leading up to February 5th.
>
> A. Okay.
>
> Q. You and I walked through your family's history of cardio issues. His father passing away at an early age. His brother passing away at an early age. And you stated that he, before this accident, was keeping tabs on his cardio health. And his cause of death is listed as cardiopulmonary arrest. It's your belief that the accident caused the heart attack.
>
> A. I feel like the stress and pain of his body and the anxiety and all of that is what caused it[.]

This testimony was not objected to.

Cody Sonnier also testified by way of deposition, introduced in opposition to the motion. He shed further light on his father's condition leading up to his death:

11

Q.    When you described your dad earlier, his post-accident complaints about his injuries, what were those again, specifically?

A.    His injuries?

Q.    Yeah.

A.    I mean, after the accident, what he was going through?

Q.    Yeah.

A.    Back, head, I mean, his whole body hurt. I mean, he threw up literally every day. Every day.

Given the cited submissions, we find that there is a genuine issue of material fact as to the causal relationship between the physical and emotional injuries suffered by Mr. Sonnier in the accident and his subsequent heart attack. However, we will also consider whether the initial affidavit of Relators' expert in cardiology was properly excluded.

Relators submitted affidavits by Dr. Mulhearn in opposition to the motion. While the trial court rejected consideration of the affidavits after Defendants' challenge, we find that the initial affidavit is neither objectionable in its form nor its content, at least in part. First, La.Code Civ.P. art 967(A) provides the following:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. The supporting and opposing affidavits of experts may set forth such experts' opinions on the facts as would be admissible in evidence under Louisiana Code of Evidence Article 702, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or by further affidavits.

Article 967(A) expressly uses the term "may" in providing what an expert's affidavit can show, but states that it must affirmatively show that he or she is competent to testify as to the matters in the affidavit. If papers or documents are

12

specifically referred to, they must be attached. It is noted here and acknowledged by Defendants that there was no objection made to Dr. Mulhearn's qualifications to give the affidavit under the prerequisite of La.Code Civ.P. art. 702. The affidavit provides the following:

1.  Affiant is of full age of majority and competent to testify to the facts stated herein.

2.  I am a board-certified interventional cardiologist, and I practice at my clinics which include Imperial Health – Cardiovascular Specialists in Lake Charles and Sulphur, Louisiana and at the Imperial Health Research Department. My current CV is attached.

3.  Based on my education, clinical experience and review of the scientific and medical literature and studies, stress and anxiety can cause and/or contribute to a myocardial infarction (heart attack), as in the case of Joseph Sonnier, especially in someone who may have specific underlying conditions.

4.  I was asked to review a case involving Joseph Sonnier, which included a review of pertinent medical records, depositions and other materials.

5.  Based upon my review, on September 23, 2020, Joseph Sonnier was involved in a motor vehicle accident which, according to his treating physicians, caused Joseph Sonnier to sustain severe back and neck pain, a concussion along with post-concussive syndrome and a head/brain injury.

6.  The September 23, 2020 motor vehicle accident caused Joseph Sonnier severe injuries and a [sic] tremendous amount of pain and dysfunction which required the need for an epidural steroid injection by Dr. Jayme Trahan on February 5, 2021, which caused Mr. Sonnier a enormous amount of anxiety and stress which, more probable than not, caused or contributed to his fatal heart attack of February 5, 2021. The motor vehicle accident of September 23, 2020 was a substantial factor in causing Joseph Sonnier's heart attack and death on February 5, 2021. Mr. Joseph Sonnier's death certificate is attached to this affidavit as well.

7.  In addition, I can attest that the medical records establish that Joseph Sonnier was required to, and did abstain from, taking his daily medications of aspirin and Plavix (blood thinners) within five (5) days preceding his scheduled epidural steroid injection and his death. To a reasonable degree of medical certainty, aspirin and Plavix are blood thinners that can have a protective effect in preventing heart attacks and by removing these

13

medications, it is my opinion that Joseph Sonnier's risk of heart attack increased.

The affidavit of Dr. Mulhearn sufficiently sets forth his qualification to testify as an expert in the field of cardiology, at least as to this motion. Further, Defendants state, in reply to this writ application, that there is no objection in that regard. Dr. Mulhearn then opines, based upon his training, experience, and review of the scientific and medical literature and studies, that stress and anxiety can cause and/or contribute to a myocardial infarction, otherwise known as a heart attack. The fact that he did not attach the specific medical literature relied upon does not lessen the impact of his education and training as the basis for his opinion. Thus, this portion of the affidavit equating stress, at the least, to an increased risk of heart attack, without considering the remainder, is admissible. It is this portion which creates a material issue of fact that remains unanswered. This question of fact is for the trial court or jury to ultimately decide at a trial on the merits by weighing all of the evidence and testimony, lay and expert. The weighing of evidence has no place in the decision of whether to grant a motion for summary judgment. *Hines v. Garrett*, 04-806 (La. 6/25/04), 876 So.2d 764. Accordingly, our *de novo* review of the record here requires that we grant the writ and deny the motion for partial summary judgment.

**WRIT GRANTED AND MADE PEREMPTORY:** The decision of the trial court granting Defendants' motion for partial summary judgment dismissing Relators' wrongful death claims is reversed. The motion for partial summary judgment is denied, and the case is remanded for further proceedings consistent herewith.

14