ROGERS, Justice.
 

 This is a tort action growing out of a collision between automobiles. As a result of the accident, plaintiff claims damages for the injuries and death of his wife, for his own injuries, and for medical and other expenses which he incurred.
 

 The trial judge found that the accident was due to the negligence of the operator of the defendant company’s automobile, and he awarded plaintiff judgment for $7,500 for the injuries and death of his wife, $2,500 for his own injuries, and $723.25 for damages to his car, and for medical and other expenses, or a total of $10,223.25.
 

 The Court of Appeal concurred in the finding of the trial judge that the accident resulted from the negligence of the defendant company’s employee, but disallowed the award of damages for the death of plaintiff’s wife and decreased the award
 
 *161
 
 of damages for his own injuries. The Court of Appeal allowed $2,500 for the injuries sustained by plaintiff’s wife, $750 for hfs own injuries, and $723.25 as expenses for repairing plaintiff’s car and for the medical and other expenses incurred by him, or a total of $3,973.25.
 

 A writ of review has brought the case before us for our consideration and decision.
 

 The question of liability for the accident has been settled by the decree of the Court of Appeal, affirming the judgment of the district court, fixing such liability on the defendant. Therefore, the only question presented for decision is the extent of defendant’s liability as measured in the damages suffered by plaintiff. That question primarily involves plaintiff’s claim for damages resulting from the death of his wife, which claim, was rejected by the Court of Appeal.
 

 Mrs. Shaffer died nearly four months after the accident. The trial judge found that she died as a result of the injuries which she had received. The Court of Appeal, as we interpret its decision, held that while the injuries to Mrs. Shaffer might have contributed to her death they were not the principal cause of death.
 

 The Court of Appeal apparently rested its decision mainly upon the certificate of the local physician, who happened to be the coroner, summoned just before the death of Mrs. Shaffer. This physician saw Mrs. Shaffer only about twenty minutes before she died. His certificate of death reads as follows, viz.:
 

 “The principal cause of, death and related causes of importance in order of onset was as follows:
 

 “Chronic nephritis
 

 “Chronic Myocarditis
 

 “Hypertension
 

 “Arterio Sclerosis
 

 “Contributory causes of importance not related to principal cause:
 

 “Automobile accident 3 months ago probably contributory.”
 

 Plaintiff offered the certificate in evidence without any restriction. No obj ection to the offer was made by defendants. Hence, we see no reason why the certificate should not be considered at least a prima facie evidence of the facts therein stated. Our appreciation of the legal effect of the certificate will be set forth in the general discussion of the case.
 

 The record discloses that plaintiff’s home was in the parish of Terrebonne. The collision in which plaintiff and his wife were injured took place on the night of February 10, 1933, while they were returning to their home from the city of New Orleans. The accident occurred at a point near the town of Westwego, Jefferson parish, on the highway known as the “Old Spanish Trail.” Mrs. Shaffer was brought to the Touro Infirmary, in the city of New Orleans, where she remained for eight, days. Thereafter she was removed to the Monteleone Hotel, in the same city, where she remained for a period of approximately two weeks. While in the hospital, Mrs. Shaffer was confined to bed. In the hotel she was not continuously confined to bed, but had a
 
 *163
 
 nurse in constant attendance. Her medical attendant was Dr. Mattingly with Dr. Hume, a specialist in diseases of the throat, acting as consultant. After she returned to her home in Terrebonne parish, Mrs. Shaffer remained under the care of Dr. Mattingly, visiting New Orleans for treatment whenever her physical condition permitted. Just before she died Dr. Danos, a local physician, was called to attend her, which he did for about twenty minutes, when she passed away.
 

 The record leaves no room for doubt that Mrs. Shaffer received a serious shock and severe injuries as a result of the accident. She sustained a concussion of the brain. The left side of her face was extensively lacerated and she suffered a compound comminuted fracture of the left cheekbone. She sustained numerous contusions and brush burns. She was cut in many places about the head. One of her teeth was knocked out, and her lip was so badly cut it had to be sewed up. Her nose was cut open and a piece of it was cut out entirely. The opening in her face was so large that it had to be stitched'on the inside first and the skin pulled over and sewed together after, requiring a double row of stitches. She suffered a partial paralysis of the face with the resultant distortion of her face and impairment of her power of mastication. She had in addition a serious traumatic injury to her larynx. Dr. Mattingly, the attending physician, testified that it was a crushing injury, with a probable displacement of the fragments of bone, and a springing back into position. In the words of the witness: “The cartilage would give where the bone would not. The voice box was crushed or thrown out of place and then it rebounded back in position and stayed that way.” As a result of this particular injury Mrs. Shaffer lost her power of speech.
 

 Dr. Hume, a specialist in diseases of the throat, was called in consultation by Dr. Mattingly. Dr. Hume saw Mrs. Shaffer twice — on March 1 and on May 4, 1933. He examined Mrs. Shaffer’s throat and found that she was suffering from “laringual trauma involving the left side of the larynx.” Dr. Hume testified that whenever the larynx is injured a diseased condition attaches, starting an inflammation of the membrane covering the cartilages. He further testified that the injury to Mrs. Shaffer’s larynx resulted from the accident and that the injured condition would be permanent.'
 

 The record discloses that Mrs. Shaffer was fifty-six years old at the time of the accident. Prior to that time beyond the usual myocardiac changes in a' person of her age, her general health was good. She never had consulted a doctor and never had received any medical treatment for her heart. Dr. Danos was not her family physician and was only called to attend her in the emergency arising just prior, to her death. He saw her for about twenty minutes before she died.'
 

 Mrs. Shaffer died on June 3, 1933. Although the last time she saw Dr. Mat-tingly was on May 4, 1933, when she was. brought to New Orleans' for that purpose, there is nothing in the record to show that Mrs. Shaffer was discharged as cured by Dr. Mattingly or that he considered that
 
 *165
 
 she had recovered from her injuries. On the contrary, as shown by his testimony, Dr. Mattingly was of the opinion from the beginning that Mrs. Shaffer was fatally injured. That his opinion was not changed by his examination of Mrs. Shaffer the last time he saw her, which was as stated on May 4, 1933. That at that time he still considered the odds against her recover}'-. As he expressed it, “that she had enough for the average person to die, and she died.”
 

 Dr. Mattingly testified in part as follows, viz.: “In my mind the most serious of all was the injury to the larynx; by itself, in most cases, it is fatal. On this point — I do not remember if the doctor (Dr. Ficklen) will recall it on the other side, but I told him probably a month before she died that Mrs. Shaffer would probably die. In my experience at the Charity Hospital over a period of several years, I have learned that infections of cartilage are extremely dangerous and have great resistance to treatment.” Again Dr. Mat-tingly testified as follows, viz.: “From what I could see approximately a month before my prognosis for her recovery was nil for all practical purposes. I thought a month before that she was going to die.” And he was asked: “Q. You mean a month before she actually died?” His answer was: “A. I mean about a month after I- had been treating her, I figured it that the ultimate result would be death.” Dr. Mattingly also testified, as shown by the following question and answer quoted from the record: “Q. As I understand your testimony Dr. Mattingly, in your opinion, death resulted from this accident, without regard to any myocardiac condition that she might have had at that particular time, that death would have resulted ? A. I can only speak from the last time I saw the patient. I would repeat what I said before, that I thought she had enough to really — that the odds were against her recovery — -that she had enough for the average person to die, and she died.”
 

 We find nothing in the testimony of Dr. Hume which detracts from the force of the testimony of Dr. Mattingly. Dr. Hume never testified that in his opinion there was no connection between the injury to Mrs. Shaffer’s larynx and her subsequent death. He stated that Mrs. Shaffer was suffering from her injured larynx when he first saw her. When asked whether she was still suffering when he last saw her, his answer was: “A. I have no record — I don’t recall whether she was or not. The suffering, I think was generally passed, because it was fixed, and really at that time the pain is chiefly passed, but the loss of function is still present.” In a certificate issued by Dr. Hume under date of May 4, 1933, it is stated that a membrane covering the cartilage shows no acute changes or evidence of infection and that it is the doctor’s belief the function of the larynx would be permanently impaired. Dr. Mat-tingly, on rebuttal, stated, when asked concerning Dr. Hume’s statement about the membrane: “Membrane — that does not include cartilage.” Dr Hume’s original diagnosis, as shown by his testimony, was that Mrs. Shaffer was suffering from “laringual trauma involving the left side
 
 *167
 
 of the larynx.” The purport of Dr. Hume’s testimony and certificate, as we appreciate it, is that the pain suffered by Mrs. Shaffer as the result of her injured larynx while severe in the beginning had subsided, but had not entirely disappeared, the last time he saw her.
 

 Dr. Mattingly testified the statement in the report that there were no “acute” changes in the membrane did not mean that there was no “sub-acute” or “chronic” change in the membrane. He testified that the cartilages of the larynx were inflamed. His testimony is supported by a certificate signed by him and Dr. Ficlclen under date of May 10, 1933. Dr. Ficklen/was apparently employed by the defendant company to examine Mrs. Shaffer. He was placed on the witness stand by the defendants, and after being sworn was withdrawn without being asked a question. The joint certificate of Drs. Mattingly and Ficklen shows that they examined Mrs. Shaffer on May 4, 1933. Among their findings resulting from that examination appears the following as set forth, in their certificate, viz.: “There is considerable induration and low-grade inflammation in the left cervical region, particularly about the cartilages of the larynx.” The certificate further declares that: “This patient shows a marked nervous phenomena since the accident.”
 

 At one point in his examination, Dr. Mattingly was asked the following question: “Q. Do you know what caused Mrs. Thomas Shaffer’s death?” Defendants’ counsel objected that it was hearsay. The court then stated: “He (the witness) can answer that question yes or no.” The witness then answered: “A. To say the exact cause of her death not seeing her, I believe would be asking a little too much.” The court then asked the following question : “Q. Then you don’t know, would you say that, Doctor?” The answer of the witness was: “A. I don’t know — as to this accident, I predicted — ” Before the witness could complete his answer defendants’ counsel interposed the following objection: “I object to the reason being stated.” And the court held that the obj ection was good. In our opinion, that isolated statement of the witness is not sufficient to support defendants’ contention that the witness did not know the cause of Mrs. Shaffer’s death, particularly as the witness was prevented by the objection of defendants’ counsel from explaining his statement.
 

 In appraising its effect, testimony must be considered as a whole. The true meaning of the answers of a witness to isolated questions must be ascertained by considering all the questions propounded to the witness and his answers thereto.
 

 Clearly, the particular statement of the witness now under consideration cannot be construed to mean that the witness did not know the injuries received by Mrs. Shaffer were the contributing cause, if not the direct cause of her death. And taken as a whole, his testimony shows that, in his opinion, Mrs. Shaffer’s death was due to the injuries which she received in the accident caused by the negligence of the defendant company’s employee. We have referred to and quoted some of his testi
 
 *169
 
 mony on that point. At another place in his testimony, Dr. Mattingly stated that the injuries suffered by Mrs. Shaffer increased the load on her heart, which was in the condition to be found in any normal woman of her age, but that in his opinion her injuries with the resulting changes ■were sufficient to have caused her death, notwithstanding any existing heart condition. He was asked the direct question: “Q. Dr. Mattingly, in your opinion, would her (Mrs. Shaffer’s) injury have been sufficient to cause death, even though she had no myocardiac condition at all?” And his answer was: “A. I would say that her condition, the condition present, was serious enough to cause death, taking Mrs. Shaffer as a normal woman at fifty-nine ■years of age.”
 

 While the certificate of Dr. Danos, which we have hereinabove quoted, shows that in his' opinion, apparently formed after professional attention of only twenty minutes, the principal cause of Mrs. Shaffer’s death was a certain diseased bodily condition which he set forth, it also shows that the contributing cause of death was the injury that Mrs. Shaffer had received in the automobile accident which had occurred three months before. Any other interpretation of the wording of the certificate would be wholly inconsistent with the proved facts and with reason and common sense as applied to other credible evidence.
 

 The record satisfies us that the accident in which she was injured was the cause of Mrs. Shaffer’s death. That is so whether her death was caused directly by the injuries which she received in the accident or whether her death was due to a previously existing bodily disease accelerated to a mortal end and sooner than otherwise it would have come.
 

 In Behan v. John B. Honor Co., 143 La. 348, at page 351, 78 So. 589, 590, L.R.A.1918F, 862, this court said: “But it is well settled in the jurisprudence elsewhere that the fact that a person was already afflicted with a dormant disease that might some day produce physical disability is no reason why he should not be allowed damages or compensation for a personal injury that causes the disease to become active or virulent and superinduces physical disability.” Citing Hilliard v. Chicago City Railway Co., 163 Ill.App. 282; Larson v. Boston Elevated Railroad Co., 212 Mass. 262, 98 N.E. 1048.
 

 In Hooper v. Standard Life & Accident Ins. Co., 166 Mo.App. 209, 148 S.W. 116, it was held that: “Where a man is sa afflicted that he will die from such affliction within a very short time, yet if, by some accidental means, his death is caused sooner, it will be a death from ‘accident,’ within the meaning of the terms of an accident insurance policy.”
 

 There can be no doubt such is the law, because it has been adopted by practically every court which has had occasion to pass on the question. And it follows, of course, that if á pre-existing disease brought to a crisis by accident authorizes a recovery for personal injuries resulting from the accident it also authorizes a recovery from death resulting from the accident.
 

 
 *171
 
 Our conclusion is that the district court was correct in awarding plaintiff damages for the death of his wife and that the Court of Appeal erred in setting aside the award.
 

 The district court in its judgment awarded plaintiff a total of $7,500 for the injuries, suffering, and death of his wife. The amount of the award is clearly not excessive. On the other hand, we find no sufficient warrant in the record to authorize any increase in the amount awarded.
 

 The district court allowed plaintiff $2,000 for the injuries received by him personally. The Court of Appeal reduced this allowance to $750. Plaintiff’s injuries while painful were not serious. His medical treatment lasted about two or three weeks. Our examination of the record has forced the conclusion that on this item of plaintiff’s claim the Court of Appeal is more nearly correct than the district court. Both courts are in agreement on $723.25 as the amount due plaintiff for expenses and for the damage to his automobile.
 

 Therefore, our conclusion is that plaintiff is entitled to a total award of $8,973.25, instead of $3973.25 as awarded him by the Court of Appeal — for damages for the death as well as the suffering of his wife, $7,500; for his own injuries, $750; and for expenses and damage to bis automobile, $723.25. Judgment will be rendered accordingly.
 

 For the reasons assigned, the judgment of the Court of Appeal is annulled, and it is now ordered that there be judgment in favor of plaintiff Thomas A. Shaffer and against the defendants Southern Bell Telephone and Telegraph Company, Inc., and John R. Catoire, in solido, in the full sum of $8973,25, with legal interest thereon from January 18, 1934, until paid, and all costs of this suit.