186 So.2d 174 (1966)
Mary J. REZZA, widow of Salvador J. Rezza, Individually and on Behalf of the minors, Salvador J. Rezza, Jr., and Dominick Henry Rezza
v.
Frank CZIFFER and Employers' Liability Assurance Company.
No. 2185.
Court of Appeal of Louisiana, Fourth Circuit.
May 2, 1966.
Oneal C. Legendre, Jr., Kenner, for plaintiff-appellee.
Breard Snellings, of Sessions, Fishman, Rosenson & Snellings, New Orleans, for defendants-appellants.
Before McBRIDE, REGAN and HALL, JJ.
*175 McBRIDE, Judge.
On the night of May 25, 1961, Salvador J. Rezza was involved in an automobile accident. His automobile, which he had stopped in obedience to a red semaphore signal light, was run into from the rear by a following vehicle which had been propelled forward as the result of being negligently struck by an automobile driven by Rev. Frank Cziffer. Rezza, who was either 47 or 50 years old (the evidence is not clear on this point), was injured and died July 18, 1961, (54 days after the accident). His widow instituted this tort action against Rev. Cziffer and his liability insurer claiming that her husband's death was caused or contributed to by the accident and she seeks to recover damages for wrongful death and attendant expenses.
She was awarded a judgment of $22,964.11, from which the defendants have appealed. Rev. Cziffer's negligence is conceded and the prime issue in the case is whether there was causal connection between the accident and the ensuing death.
For some years Rezza was a very ill man. He had been under treatment by Dr. H. M. Horack for heart disease more than nine years prior to the accident. He had been in and out of the hospital on several occasions. As far back as 1951, he had a rheumatic heart condition with stenosis or narrowing, thickening and stiffening of the aortic valve which keeps blood from refluxing back into the heart from the aorta after each expulsion thereof by the left ventricle. In 1955 the showing was his heart continued to enlarge with progressive and deteriorative changes. In June of 1957, he had the first episode of fainting and in October of 1957 had a left bundle branch block (blood conduction disturbance). He was apparently in congestive heart failure because he was confined to bed rest with a low salt diet in November 1957. In June 1958, his heart size was 20% larger than normal and five months later he was digitalized for congestive heart failure. By April of 1961, he had far-advanced heart disease and increasing symptomatology.
The poor condition of Rezza's heart could have resulted in death at any moment; however, Dr. Horack stated that sometimes patients live normal life spans notwithstanding they suffer from such a heart condition. Dr. Horack observed: "I don't know when anyone is going to die".
Dr. Horack, who treated Rezza up to his death, appeared as a witness for plaintiff. Defendant's medical expert was Dr. Samuel Nadler, an internist, who had never seen Rezza and whose testimony was confined to a recital of the contents of the various hospital records and to his opinions based on the information therein contained.
The two physicians seem to agree on every detail with one exception and that is whether the accident superinduced a condition termed auricular fibrillation. This is an irregular and unusually rapid beating of the heart which puts a load on an already overburdened organ and particularly where a patient, such as Rezza, is afflicted with organic heart disease. Auricular fibrillation aggravates the deteriorated condition and can hasten total congestive heart failure.
Dr. Nadler admitted that none of the hospital records for any period prior to the accident showed or indicated that Rezza ever had auricular fibrillation. Dr. Horack testified that there had been no prior existence of fibrillation and that it was only after the accident that such condition manifested itself and that when he examined Rezza on June 1, 1961, the seventh day thereafter (which was the first time he had seen Rezza subsequent to the accident) he detected auricular fibrillation.
Mrs. Rezza related the condition of her husband when she arrived at the scene of the accident thus:
"* * * my husband was holding his neck and he had one hand on his chest and he was quite upset, and he was suffering and I asked him what happened. *176 He said, or told me that he was hit by a car while he was parked for the red light, and so I tried to calm him. I tried to sit him down, but he couldn't be calmed. He was quite upset, in fact, he just got away from me yet he was holding onto his chest and he said that his chest was hurting him. I asked him where were the nitroglycerin tablets and he said, `I'm all right, I took a couple of them.' He told me it hadn't relieved him and as a rule those things relieve him in a little while, but it hadn't relieved him and I couldn't keep him quiet at all. And he was upset about the whole thing, and he was suffering. So then it was about a half hour after I had gotten there that I finally got him to the hospital. He was in pain. * * * He was nervous and I couldn't even get him to calm down. He was quite upset, he was angry and he wanted to go around and punch the man that caused the accident and things like that. I couldn't hold him."
The defendants attempted to counteract plaintiff's testimony concerning the emotional state of her husband through the testimony of defendant Cziffer. However, under cross-examination he testified he had left the scene prior to the arrival of Mrs. Rezza.
Mrs. Rezza had her husband conveyed to Ochsner Hospital the night of the accident and he was there examined and given emergency treatment by a doctor to whom he gave the following recorded complaints:
"Auto accident. Car hit him in rear. Has pain in neck and back. No lacerations. Was not unconscious. Also has pain in right hip."
Rezza was released from the hospital about four hours later and permitted to go home with instructions that he take to his bed. Mrs. Rezza testified he remained in bed until June 1, 1961 with complaints of pains in the chest and an irregular heart beat.
Mrs. Rezza claims she called Dr. Horack on May 28 and explained her husband's symptoms and that Dr. Horack told her to bring him to his office which she did on June 1.
Rezza told Dr. Horack of the accident and complained of pain in his neck, lumbar region, and in the right hip which had been followed by pain in the interior chest and that he experienced coughing. Dr. Horack deduced from Rezza's statements that he also had premature spasm, a heart beat that occurs prematurely "prior to its ordinary sequence." Upon determining that Rezza was experiencing auricular fibrillation, Dr. Horack increased "his digitalis" and allowed him to go home. Digitalis is a drug used to strengthen the heart and control the rate of fibrillation or, in other words, to reduce the rapidity of the heart beats.
Rezza remained at home in bed until June 9, 1961, when he was again conveyed to the hospital and given quinidine and converted to a normal sinus rhythm. However, he reverted again to fibrillation but reconverted with further medication. On June 22, 1961, with a regiment including a quinidine preparation, digitalis, low salt and restricted activity, the patient was discharged.
On June 28, 1961, plaintiff's husband was admitted for the final time to Ochsner Hospital with symptoms of congestive heart failure and auricular fibrillation. The fibrillation and congested heart failure failed to respond to the usual medication. Anticoagulants were commenced July 12. From thence through his remaining days Rezza was confused and disoriented. During his last days fever prevailed and the patient suffered severe chest pains. On July 18, 1961, he breathed only with extreme difficulty and on that afternoon he died. The contributing cause of death was auricular fibrillation with congestive heart failure.
An unfortunate incident occurred about nine hours before Rezza's death that should be mentioned. At 3:00 a. m., on July 18, the resident physician who was on call was *177 informed by a nurse that Rezza had left his bed and had gone downstairs. The physician found the patient, his wife, and a nurse in the parking lot. Rezza was endeavoring to persuade his wife to give him the keys to their car so that he could go home. He kept repeating that he had brought a package to the hospital and there was no reason for him to stay. After about ninety minutes, Rezza finally returned to his hospital floor. The medical testimony is that Rezza was in congestive heart failure at the time of that incident. Everyone agrees that his confusion and disorientation stemmed from the malfunctioning of his heart and he was not mentally responsible. Dr. Nadler was of the opinion the incident in the parking lot "definitely contributed to his death".
There is no evidence showing that the defendant sustained any injuries in or about the chest. What plaintiff is contending is that the emotional excitement, stress, strain and anger engendered by the accident provoked the fibrillation. The evidence in the case is clear and convincing that anger and strain is a potential cause of fibrillation and could have triggered that condition in a person with heart disease. Dr. Horack stated:
"* * * Now, we feel strongly enough about this in our laboratory that when we have a patient that we are studying pulmonary functions or heart functions we don't let them do any straining because we fear they will provoke cardiac."
Dr. Nadler said auricular fibrillation
"* * * can start as a result of trauma to the chest, and it can start as a result of severe emotional excitement. Now, as far as I know he did not have trauma to his chest. He may have had emotional excitement on the day of the accident and had been disturbed about it."
Dr. Nadler's opinion that the accident did not precipitate the fibrillation is based on the circumstance that such condition did not develop until several days after the accident and
"* * * I believe that auricular fibrillation on the basis of what I just said started several days later and, perhaps as late as the day or the day before the man appeared at the clinic on June 1, 1961. So whereas I cannot answer your question positively I think this reasoning led me to believe that the injury to his neck really did not play a role in the production of his auricular fibrillation. I think this is the spontaneous onset of auricular fibrillation, and I'm surprised really that he didn't have it before this time, because it's very common in rheumatic and aortosclerotic heart diseases, expecially a combination of these two."
However, Dr. Nadler admits that a patient might be undergoing fibrillation without even being aware thereof. This factor tends to militate against the force of his above stated opinion. He testified:
"Q. * * * Is it possible for a person to fibrillate and not be aware of it?
"A. Yes, sir.
"Q. If this would be the normal circumstances, or what would be the normal circumstances where this would occur?
"A. Well, an individual who starts fibrillating ordinarily will be aware, and when I say ordinarily I would say ninety per cent of them are aware of it. In some individuals by virtue of a change in the artero-circulation the heart, the fibrillation is automatically slow because there is damage to the conducting mechanism. Am I making myself clear?
"Q. Yes, you are."
* * * * * *
"Q. Now, getting back to my original question, assuming Mr. Rezza to be under treatment would it be possible for Mr. Rezza to have had fibrillation following the accident without knowing it?
"A. Yes."
*178 Dr. Nadler also stated that the drugs which had been administered could have had the effect of reducing the rate of Rezza's heart beats.
We find nothing in the testimony of Dr. Nadler which detracts from the weight of the testimony of Dr. Horack, whose opinion was that the accident had causal connection with the death.
At Tr. 124 Dr. Horack was asked: "* * * in your opinion do you feel that the accident was a contributing factor insofar as the death of Mr. Rezza"? and he answered: "I think certainly that it was a contributing factor."
Again at Tr. 128 we find the following testimony emanating from Dr. Horack:
"Q. Well, rephrasing it, doctor, and again not to be repetitious do you feel that the accident was, or aggravated or contributed to the death of Sal Rezza?
"A. That I do.
"Q. You do?
"A. Yes, sir."
Counsel for defendants point up certain statements made by Dr. Horack and argue that the import of it demonstrates his unsureness as to causal connection. The testimony in question runs thus:
"Q. In Sal Rezza's case knowing the treatment that you have given him, how he had responded to this treatment, do you feel that the accident did in fact throw him into auricular fibrillation?
"A. I don't know if I can honestly answer that. If you ask could it the answer is yes. But if you say did it I can't say that."
In appraising its effect, the testimony of any witness should be considered as a whole. The true import of the statements of a witness to isolated questions must be ascertained by taking into consideration all the questions propounded to him and all of his answers thereto. The particular statements of Dr. Horack which defendants call to our attention cannot be construed to mean that the witness would be unable to say the injuries received by Rezza were the contributing cause, if not the direct cause, of his death. Taken as a whole Dr. Horack's testimony shows that, in his opinion, death resulted from the injuries which decedent received in the accident caused by the negligence of the tort-feasor.
We agree with the following observations appearing in Sharp v. Esso Standard Oil Co., 72 So.2d 601, decided by the late Court of Appeal of Louisiana, First Circuit, towit:
"A court, in applying medical evidence to facts in a case of this kind, has to apply common sense and everyday experience to correctly resolve a situation. We know medical science knows more about these things than we do, and our experience has been, from hearing testimony of this kind, that when a doctor says `possible' or `probable', he does not mean that it did not happen as contended in the sense that an ordinary layman would understand his words. In giving their testimony, all medical experts try to give guarded testimony, and some courts try to draw a distinction between possibilities and probabilities. To our way of thinking and to the modern trend of the courts in considering these terms, we should look at them in a commonsense way."
In this case the entire body of the medical testimony is composed of that emanating from the treating physician on the one hand and that of defendants' physician on the other, the latter having been employed by defendants to examine the hospital records and state his opinions therefrom as to the cause of Rezza's death. In such circumstances courts are inclined to accord more weight to the testimony of the attending physician than that given by *179 other experts who merely examined the patient for the purpose of testifying in court. Wiewiarawska v. Checker Cab Co. of New Orleans, La.App., 182 So.2d 832; Matherne v. Wheless Drilling Company, La.App., 174 So.2d 921; Jones v. Sears, Roebuck and Co., La.App., 140 So.2d 798; Bankston v. Aetna Casualty Co. of Hartford, Conn., La.App., 132 So.2d 111; McNulty v. Toye Bros. Yellow Cab Co., La. App., 73 So.2d 23; Washington v. T. Smith & Son, La.App., 68 So.2d 337; Trascher v. Eagle Indemnity Co. of New York, La. App., 48 So.2d 695, and Vienne v. Chalona, La.App., 28 So.2d 154.
Our opinion is that the automobile accident on May 25, 1961, was the proximate cause of Rezza's death there being a natural, direct, continuous, unbroken and interrelated sequence between the negligent act and the victim's death without intervening cause. There was the accident, the emotional stress and strain, the fibrillation which caused the disorientation and the incident in the parking lot, and then death. In Louisiana the consequences of emotional trauma such as fright, or nervousness are recognized as damages in tort cases. Steward v. Arkansas Southern R. Co., 112 La. 764, 36 So. 676; Pecoraro v. Kopanica, La.App., 173 So. 203; Klein v. Medical Building Realty Co., La.App., 147 So. 122, and Laird v. Natchitoches Oil Mill, Inc., 10 La.App. 191, 120 So. 692.
This court, in Zito v. Schneller, La.App., 133 So.2d 169, awarded damages in a tort action to a man sixty-nine years old of excitable temperament and having arteriosclerosis who suffered a severe emotional trauma produced by the accident and which was thereafter aggravated by worry.
It is true that Rezza was afflicted with a serious bodily infirmity which most likely would have shortened his life. But the law is well settled that the duty of care and of abstaining from injuring another is due to the weak, the sick and infirm equally with the healthy and strong, and when there is a violation of that duty the measure of damage is the injury inflicted, and if a pre-existing disease is brought to a crisis by negligence, a recovery for personal injuries resulting therefrom is authorized against the wrongdoer, as well as a recovery if death results from the accident. Shaffer v. Southern Bell Telephone & Telegraph Co., 184 La. 158, 165 So. 651, 655; Lapleine v. Morgan's L. & T. R. & S. S. Co., 40 La.Ann. 661, 4 So. 875, 1 L.R.A. 378, and Walker v. Joseph P. Geddes Funeral Service, La.App., 33 So.2d 570. The first cited case involved a fifty-four year old woman whose death occurred from pre-existing heart trouble three months after her condition was aggravated by the accident.
We find no error in the allowance of $2,964.11 for special damages consisting of injuries to the Rezza automobile, hospital expenses, Dr. Horack's bill, emergency treatment and funeral costs and expenses, but we are of the opinion that the trial judge abused his discretion in allowing $20,000 to Mrs. Rezza for the loss of love, affection and companionship and the monetary loss sustained by the community resulting from Rezza's death.
Resorting to prior discussions as guide lines for the allowance for wrongful death, we find several cases in which $10,000 was awarded to the surviving widow for the loss of love, affection and companionship of a healthy husband with a normal life expectancy. But in Payton v. Great American Indemnity Co., La.App., 83 So.2d 575, (cert. den.) the court awarded $5000 to a widow for the death of her fifty year old husband who was afflicted with a heart condition and whose death the court felt was a result of an automobile accident. In that case the decedent sustained severe injuries consisting of bruises and contusions over his entire body, a vertebral fracture and severe shock. He died the following day. The court reviewed the *180 various cases in which awards of $10,000 had been allowed the widow and then said:
"In the cited cases no contention or showing was made that the deceased parties were suffering from any disease, ailment or infirmity that might have detracted from their chances of living out their normal life expectancies. Such was not the situation here. Payton was already suffering from and afflicted with a serious heart ailment which materially affected his activities and no doubt his income. Whether or not, but for the accident, he would have lived out his period of life expectancy is problematical, beyond the realm of human power to foretell. At the best, it was not likely."
In addition to remuneration for loss of love and companionship the widow in most cases was also granted damages for loss of support.
The evidence shows that the yearly earnings of Rezza were:

1959 ..........................$ 804
1960 .......................... 734
1961 .......................... 1440

The earnings for the first two of said years were derived from Rezza's charter boat business. During the same period Mrs. Rezza's earnings from a position she held with National Airlines averaged about $7500 per year. The 1961 earnings of Rezza emanated from his new job with the Housing Authority upon which he embarked January 1 of that year at a salary of $240 per month. Taking into consideration the decedent's condition at the time he was injured, in conjunction with the medical testimony that the death of a patient such as Rezza, afflicted with a heart condition would most likely occur in the second, fourth or fifth decades of life, we do not think that earnings for a normal life expectation should be considered in formulating the damage awarded. Of course, it may have been, as Dr. Horack pointed out, that the decedent would have lived out a normal life expectancy in spite of his precarious state of health. However, the deteriorated condition of plaintiff's husband cannot be overlooked. Our firm belief is that an award of $10,000 to Mrs. Rezza for the loss of love, affection and companionship, and the monetary loss of support and enhancement of the community would satisfy the ends of justice.
For the reasons above stated, the amount of the judgment appealed from is reduced to $12,964.11 and as thus amended and in all other respects the judgment appealed from is affirmed; costs of this appeal are to be paid by the appellee.
Amended and affirmed.