305 So.2d 643 (1974)
Patrick O'DONOVAN, Plaintiff-Appellee,
v.
BANKERS LIFE AND CASUALTY COMPANY, Defendant-Appellant.
No. 4802.
Court of Appeal of Louisiana, Third Circuit.
November 27, 1974.
*644 James T. Guglielmo and Edward Dubuisson, of Dubuisson, Brinkhaus, Guglielmo & Dauzat, Opelousas, for defendant-appellant.
Perrell Fuselier, Oakdale, for plaintiff-appellee.
Before FRUGE, MILLER and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a suit for disability benefits allegedly due under a sickness and accident policy issued to the plaintiff by the defendant insurance company. After a trial on the merits judgment was rendered in favor of the plaintiff granting him benefits, penalties, and attorney's fees. The defendant has appealed.
On November 1, 1970, Bankers Life and Casualty Company issued to Patrick O'Donovan a sickness and accident policy. On July 31, 1971, the plaintiff received serious injuries in an automobile accident which occurred on Louisiana Highway 10 between Ville Platte and Oakdale, Louisiana. O'Donovan was a passenger at the time of the accident, and was returning from McComb, Mississippi, where he had been employed as a laborer in pipeline construction work. He was subsequently hospitalized for a period of almost two weeks. After his release from the hospital plaintiff was examined by at least four different doctors, other than his treating physician. He has not returned to his former duties as a manual laborer since the accident and claims permanent disability as a result of the July 31, 1971, accident.
Three issues are presented by this appeal. (1) Was defendant's sickness and accident insurance policy in effect at the time of plaintiff's accident? (2) If so, is plaintiff "totally disabled" within the meaning of the policy provisions? (3) Is plaintiff entitled to penalties and attorney's fees under LSA-R.S. 22:657?

THE COVERAGE ISSUE
The aforementioned policy of insurance provided that premiums in the sum of $19.80 were due from the insured on the first of each month, following the initial premium, in order to keep the policy in force. It also provided a thirty-one day "grace period" following each monthly date on which the premium was due, during which time the insured was permitted to make payment of the overdue premium, and the policy would remain in effect. At the end of the "grace period" if the premium had not been paid the policy would terminate but could be reinstated.
Regular premium payments were apparently made by plaintiff, or on his own behalf, from the issuance date of the policy *645 on November 1, 1970, until June 1, 1971, at which time a payment was due. According to the defendant-insurer, this premium was not received by the company before June 1, 1971, or during the thirty-one day grace period following this date, and as a result it considered the plaintiff's policy to have terminated. No evidence was introduced by the defendant to indicate that premium "reminder" notices had been sent to the plaintiff prior to June 1st or during the subsequent grace period, or that notice of the policy's termination was sent to plaintiff prior to his claim for disability on September 9, 1971.
Plaintiff testified to the effect that he did not know that his policy had lapsed due to defaulted premiums on the date of his accident. Prior to this time the record indicated that he was often out of town with his job and that premium statements were sent to the house of his sister, Mrs. Alma T. Barrett in Lafayette. Mrs. Barrett testified that prior to July 16th the plaintiff called her and she told him an insurance premium was due and that plaintiff instructed her to pay the premium. Subsequently on July 16, 1971, she issued a check to the defendant-insurer for $19.80. This check was received and stamped by the defendant on July 20, 1971.
As aforementioned, plaintiff's accident took place on July 31, 1971. Subsequently some conversation took place between employees of the insurer and the defendant's brother-in-law, William Barrett, as to whether the insurance policy was in effect. Barrett testified he was told that "evidently" it was and in turn he requested some confirmation of the fact for the plaintiff.
Subsequently, the plaintiff received a letter dated August 27, 1971, from the defendant. It indicated plaintiff's policy was paid until August 2, 1971; that his last payment had been used to reinstate his policy; and that another payment was due before the "grace period" ended.
Plaintiff's claim was filed on September 9, 1971. Thereafter he received letters dated September 20, September 27, and September 30, wherein the defendant insurer claimed the policy had lapsed on June 1, 1971, because a premium had not been paid during the following grace period and that said policy had not been reinstated until August 2, 1971, TWO days after the accident. As a result, the insurance company denied any liability to the plaintiff.
The defendant argued that although the July 16th check had been received prior to the accident (July 20th), it had to be processed through administrative channels, which took some 13 days or until August 2, 1971, when the policy was allegedly reinstated. It further contends that the July 16th check for $19.80 was used (according to the policy provision) to reinstate the policy as of August 2nd and that a new premium was due on that date.
The plaintiff, on the other hand, makes the following arguments. First it is asserted that the policy became reinstated and coverage began upon the date of receipt and acceptance of the check (July 20th), which was not subsequently returned. Alternatively it is argued that the July 16th payment was applied to the previous month (June) which had not been paid, resulting in a 31 day grace period during which the plaintiff was covered by insurance. Under either argument plaintiff contends insurance was in effect and in force on July 31, 1971, the date of the accident.
We opine that both of plaintiff's arguments have merit, as is indicated by the terms of the insurance contract and testimony of defendant's employee, regarding same.
Under the policy's "Uniform Provisions" we find the following language:
"REINSTATEMENT: If any renewal premium be not paid within the time granted the Insured for payment, a subsequent acceptance of premium by the Company or by any agent duly authorized *646 by the Company to accept such premium, without requiring in connection therewith an application for reinstatement, shall reinstate the policy; provided, however, that if the Company or such agent requires an application for reinstatement and issues a conditional receipt for the premium tendered, the policy will be reinstated upon approval of such application by the Company or, lacking such approval, upon the forty-fifth day following the date of such conditional receipt unless the Company has previously notified the Insured in writing of its disapproval of such application.
. . . . .
. . . Any premium accepted in connection with a reinstatement shall be applied to a period for which premium has not been previously paid, but not to any period more than sixty days prior to the date of reinstatement."
These provisions clearly state that unless the company requires an application for reinstatement or a conditional receipt for the premium tendered, reinstatement will take place by "acceptance" of the premium by the company.
William Hennessy, the assistant department manager in the defendant's home office, policy service department, testified that the company has an "informal reinstatement" procedure without requiring an application or conditional receipt.
Therefore the policy by its own terms was reinstated merely upon acceptance of the premium by the defendant-insurer. Such acceptance must take place within a reasonable time and under the circumstances herein we deem the 13-day delay to be unreasonable. As a result we conclude that said policy was reinstated on July 20, 1971, the date the check was received and deemed accepted.
According to the policy provisions, the policy became reinstated upon applying the tendered premium to the previous monthly premium which was overdue. This was the June payment. Plaintiff then had a thirty-one day grace period during which the policy was in effect, or through August 2, 1971. Therefore defendant's insurance policy was in force on July 31, 1971, the date of plaintiff's accident.
Defendant argues that we are bound by the holding of Sibley v. Bankers Life & Casualty Company, 213 So.2d 59 (La.App. 1st Cir. 1968); that according to the decision the policy is not in force until the reinstatement process (no matter how long it takes) is complete, and as a result August 2, 1971, should be deemed the effective reinstatement date of the policy herein. We distinguish the case for various reasons. In Sibley the insured had actual knowledge that his policy had lapsed; an application for reinstatement had to be made by the defendant and approved by the company in its home office; the plaintiff was informed specifically regarding the requirements for reinstatement yet did nothing for over two weeks until an agent came to his home and persuaded him to comply with the reinstatement requirements; and most important, the court found the reinstatement procedure to have been carried out expeditiouslyi. e. received on Friday and the following Monday the policy was reinstated.
In cases involving insurance contracts which are drawn exclusively by the insurer without the participation of the insured, any possibility of doubt in the interpretation thereof must be construed in favor of coverage for the insured and against the insurer. Corkern v. Main Ins. Co., Chicago, Ill., 268 So.2d 138 (La.App. 1st Cir. 1972); Lumbermens Mutual Casualty Co. v. Robichaux, 259 So.2d 87 (La. App. 4th Cir. 1972); West v. City of Ville Platte, 237 So.2d 730 (La.App. 3rd Cir. 1970); Rambin v. Continental Casualty Co., 186 So.2d 861 (La.App. 2nd Cir. 1966).

*647 DISABILITY ISSUE
The sickness and accident policy issued by the defendant provided for payment (during the period of disability) of a $400.00 monthly indemnity to the insured if he became totally disabled due to an injury sustained while said policy was in force. "Total Disability" is defined in the policy as:
"the inability of the Insured by reasons of injury or sickness to perform each and every duty of his occupation, except that after twelve months from the commencement of any period of total disability for which Monthly Indemnity is payable, `total disability' for the balance of such period means the complete inability of the Insured to engage in each and every gainful occupation for which he is reasonably fitted by training, education or experience."
Patrick O'Donovan was unquestionably involved in a serious auto accident on July 31, 1971. Previous to the accident he had been employed by various companies involved in pipeline construction work. Plaintiff worked as a common laborer on these jobs.
Immediately following the accident plaintiff was examined and treated in the emergency room at Ville Platte Medical Center by Dr. Charles E. Fontenot, a general practitioner from Ville Platte. Plaintiff was unconscious for a period of some 24 hours but had to be treated initially for multiple lacerations of the face, scalp, hands, arms, and extremities. Subsequently plaintiff remained hospitalized for a period of eleven days, during which time Doctor Fontenot's examinations revealed plaintiff had sustained a cerebral concussion. At one period he also sustained an internal blood loss of some type which required transfusions. Additionally, plaintiff began to experience extreme "gas" in the small intestine and a large amount of abdominal swelling, the latter requiring at one point the insertion of a nasal gastric tube for relief. X-rays revealed an ileus in the abdomen which the doctor felt was due to a blunt abdominal trauma, contusion, or bruising of the intestines, causing them to malfunction.
O'Donovan was subsequently discharged from the hospital on August 11, 1971. Doctor Fontenot indicated plaintiff's initial problem following his release was occasional incapacitating headaches which lasted for about six months. The second problem was with eating and digestion of food. Plaintiff had complaints of frequent bouts of diarrhea, bloating and distension of his abdomen, and abdominal cramps, often with accompanying nausea and vomiting following eating.
Doctor Fontenot subsequently saw and treated the plaintiff regularly after the accident up to the trial herein, a period of more than eighteen months. The doctor indicated that at the time of plaintiff's last visit he still experienced post concussion headaches and dizziness but not as severe as before, in addition to his gastrointestinal problems, namely intermittent episodes of partial intestinal obstruction causing distention, followed by reactive periods of diarrhea. Doctor Fontenot was of the opinion that the latter problems were likely due to adhesions of the intestines caused by the trauma to the abdomen area during the accident. Plaintiff also experienced urethral and bladder spasms which were credited to a urinary tract infection incurred during the hospitalization and resulting prostate infection. Complaints of periodic importency were also made by the plaintiff which the treating physician considered consistent with this type of injury and resulting problems.
Doctor Fontenot concluded very strongly that as a result of plaintiff's overall condition he would be unable to return to work as a manual laborer and was presently disabled because of his injury. The doctor also indicated that he had never known the plaintiff to exaggerate and that he was *648 cooperative and followed the doctor's recommendations faithfully during the 18 month period following the accident.
Dr. Seldon J. Deshotels, a general surgeon in Opelousas, examined the plaintiff on January 8, 1973, pursuant to a referral by Doctor Fontenot. The doctor was furnished with reports from Doctor Fontenot, as well as many of the x-rays which had been ordered during plaintiff's treatment, in addition to consulting with him by telephone. Plaintiff had complaints of headaches, abdominal pains, some nausea, and intermittent abdominal cramps and diarrhea. The doctor indicated he felt that plaintiff's complaints were consistent with the injuries incurred and that such injuries must have contributed to his complaints. He attributed the cramps and diarrhea to likely abdominal trauma which could have caused intestinal adhesions, and the headaches due to a possible post concussion syndrome. As indicated by all the doctors, the only sure way to determine if intestinal adhesions are present is to operate.
The doctor further indicated a portion of plaintiff's pain was because of prostate inflammation due to catheterization in the hospital and the bed restricted patient's inability to empty his bladder properly. He also opined plaintiff's condition was aggravated by his emotional status.
In conclusion he was of the opinion that plaintiff's pain and symptoms would keep him from doing the manual labor of pipeline construction work at that time. He also indicated, however, that plaintiff should attempt to go back to some type of gainful employment and that "possibly" plaintiff could try to work, but that such depended on his motivation, the amount of pain he could tolerate, and the type of work he was accustomed to.
O'Donovan was also sent to Doctor Irving Singer, a Lake Charles physician specializing in internal medicine, on behalf of the defendant, who evaluated plaintiff on May 30, 1972. Plaintiff's chief complaints were headaches, abdominal bloating, pain, and diarrhea. The doctor was of the opinion that "most likely" anxiety and depressive reaction was responsible for plaintiff's symptoms, but he admitted that the complaints were consistent with gastrointestinal problems and he could not rule out the possibility of such organic problems being present. He concluded by stating he found nothing to contraindicate that plaintiff could not return to manual labor but he also felt before making a final decision that more evaluation was needed.
Plaintiff was also examined on behalf of the defendant by Dr. Norman P. Morin, a Lake Charles orthopaedist, on August 25, 1972. Doctor Morin found no residual orthopedic disability, but as indicated by the trial judge, since plaintiff's complaints were not orthopedic in nature, Doctor Morin's testimony is of no real assistance.
The final doctor to testify was Dr. Daniel Buller, a general surgeon of Opelousas, who examined plaintiff on March 20, 1973, also on behalf of the defendant-insurer. He disagreed with Doctor Fontenot's diagnosis of plaintiff's abdominal problem as being caused by adhesions, but admitted the only way to be sure was to operate. He considered plaintiff not to be disabled as a result of the accident and attributed plaintiff's stomach symptoms to spastic colitis associated with chronic anxiety. The doctor, however, at one point indicated there would be disability in terms of pain and discomfort but not such to interfere with his performance of work more than 30 minutes or an hour at a time.
The plaintiff, himself, also testified to the effect that he has been under the constant care of Doctor Fontenot and has been unable to return to work. He stated that his major problems were almost constant headaches and the aforementioned stomach troubles. The district judge indicated in his written opinion that he was impressed by the demeanor and testimony of the plaintiff and that his disability resulting from his accident was amply supported by the medical testimony.
*649 It is well established in our jurisprudence that the opinion of the treating physician is often to be given more weight than that of a specialist who has seen plaintiff briefly and chiefly for the purpose of evaluation rather than treatment. Bourque v. Vallot, 286 So.2d 163 (La.App. 3rd Cir. 1973); Griffith v. Bodden, 273 So.2d 609 (La.App. 1st Cir. 1973); Touchet v. Fidelity & Casualty Co. of New York, 264 So.2d 752 (La.App. 3rd Cir. 1972); Rezza v. Cziffer, 186 So.2d 174 (La.App. 4th Cir. 1966).
As is evident from the trial judge's written reasons for judgment, he based his decision of permanent disability largely on the testimony of Doctor Fontenot, the treating physician who had treated plaintiff regularly from the date of his injury to trial (and was still under his care) in addition to Doctor Deshotel's corroborative findings. We cannot say he committed error in so doing.

PENALTIES AND ATTORNEYS FEES
Plaintiff also contends that the defendant-insurer is liable for penalties and attorney's fees under LSA-R.S. 22:657[1] because the insurer failed to pay plaintiff's claim within 30 days without just and reasonable grounds. In this respect the trial judge held for the plaintiff and awarded him penalties of "double" the $400.00 monthly indemnity sum (or $800.00 per month) from 7 days after the accident (as provided in the policy) to the date of payment, plus attorney's fees in the amount of $15,000.00. He based this award on the line of cases construing the aforementioned statute and holding that an insurer cannot escape penalties and attorney's fees because it misinterpreted the legal effect of its policy provisions, citing Seguin v. Continental Service Life & Health Ins. Co., 230 La. 533, 89 So.2d 113 (1956); Thomas v. Universal Life Ins. Co., 201 So.2d 529 (La.App. 3rd Cir. 1967); and Phelps v. Southern National Insurance Co., 83 So.2d 463 (La.App. 2nd Cir. 1955).
Defendant, in turn, argues that it did not misinterpret the legal effect of its policy provisions, and in the alternative, that the penalties and attorney's fees are excessive.
We opine that plaintiff did in fact choose to interpret the legal effect of its policy and provisions when it contended that under the policy language plaintiff's reinstatement did not take place until August 2, 1971. We find this interpretation to be incorrect and therefore the defendant acted at its own risk.
As to the amount thus due, LSA-R.S. 22:657(A) clearly provides for a penalty of "double the amount of health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court."
This "double the amount" provision has, however, been interpreted to mean the plaintiff is only entitled to recover twice the amount of benefits due (or 100% of the benefits due as a penalty) rather than double the amount of benefits as a penalty, in addition to the amount of benefits. Frey v. Manhattan Life Ins. Co. of New York, 182 La. 821, 162 So. 633 (1935); Thomas v. Universal Life Ins. Co., supra, *650 and cases cited therein. The trial court was therefore in error in assessing plaintiff double the amount due ($800.00) plus the benefits in the policy$400.00.
Further we opine that the award of $15,000.00 attorney's fees is excessive. See: Dupre v. Hartford Life Ins. Co., 291 So.2d 824 (La.App. 3rd Cir. 1973).
Under the circumstances we find that the sum of $5,000.00 as attorney's fees is appropriate.
For the above and foregoing reasons the judgment of the trial court is affirmed insofar as it granted the plaintiff disability benefits in the sum of $400.00 per month from August 7, 1971, during the period of his disability. Said judgment, however, is amended insofar as penalties and attorney's fees are concerned, and it is hereby ordered, adjudged, and decreed that there be judgment in favor of the plaintiff and against the defendant as penalties, 100% of the amount of benefits due under the policy from August 7, 1971, until paid, and $5,000.00 attorneys fees. Costs of this appeal are assessed to defendant-appellant.
Affirmed as amended.
NOTES
[1] § 657. Payments of claims; health and accident policies; penalties

A. All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B, shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist. The insurer shall make payment at least every thirty days to the assured during that part of the period of his disability covered by the policy or contract of insurance during which the insured is entitled to such payments. Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court. The district court of the parish where the insured lives or has his domicile shall have jurisdiction to try such cases.